CORN EXCHANGE NATIONAL BANK & TRUST CO. ᴇᴛ ᴀʟ. *v.* KLAUDER, TRUSTEE IN BANK-RUPTCY.

No. 452.   Argued February 2, 3, 1943.—Decided March 8, 1943.

*Mr. Charles J. Biddle,* with whom *Messrs. Maurice Bower Saul, William E. Mikell, Jr., Allen S. Olmsted, 2d,* and *James McMullan* were on the brief, for petitioners.

*Mr. Bertram Bennett,* with whom *Mr. Rawdon Libby* was on the brief, for respondent.

Mʀ. Jᴜsᴛɪᴄᴇ Jᴀᴄᴋsᴏɴ delivered the opinion of the Court.

This case requires us to determine the application of the preference provisions of § 60 (a) of the Bankruptcy Act as amended by the Chandler Act of June 22, 1938,[1] to loans made on assignments of accounts receivable.

---

[1] 52 Stat. 840, 869–870; 11 U. S. C. § 96 (a).

The Quaker City Sheet Metal Company became embarrassed for want of working capital in 1938. Creditors representing a large percentage of claims later proved in bankruptcy agreed to subordinate their claims to those which might be incurred for new working capital. A creditor's committee took supervision of the business and in 1938 arranged with the petitioner Bank to advance from time to time money for payroll and other needs on concurrently made assignments of accounts receivable. At the time of bankruptcy the Company was indebted to the Bank for loans so made on contemporary assignments between January 19, 1940, and April 5, 1940. On April 12, 1940, petitioner Dearden made a loan on similar security. An involuntary petition in bankruptcy was filed against the Company on April 18, 1940, followed by adjudication on May 7, 1940. When the assignments were made they were recorded on the Company's books, but neither petitioner had ever given notice of assignment to the debtors whose obligations had been taken as security. Because of this omission the trustee challenged their right to the benefits of their security. He was overruled by the referee and the District Court, but his position was sustained by the Circuit Court of Appeals for the Third Circuit,[2] on an interpretation of § 60 (a) which conflicts with an interpretation by the Circuit Court of Appeals for the Fifth Circuit.[3] Hence we granted certiorari.[4]

Section 60 (a) as amended and applicable reads:

"A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four

---

[2] 129 F. 2d 894.

[3] *Adams* v. *City Bank & Trust Co.,* 115 F. 2d 453.

[4] 317 U. S. 617.

months before the filing by or against him of the petition in bankruptcy, . . . the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. For the purposes of subdivisions a and b of this section, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to the filing of the petition in bankruptcy . . ., it shall be deemed to have been made immediately before bankruptcy."

Section 1 (30) specifically provides that "transfer" includes an assignment.[5]

The Circuit Court of Appeals has determined, and we accept its conclusion, that at all relevant times it was the law of Pennsylvania, where these transactions took place, that because of the failure of these assignees to give notice to the debtors whose obligations were taken, a subsequent good-faith assignee, giving such notice, would acquire a right superior to theirs.[6] It held that the assignments were preferences under § 60 (a) and therefore, under the terms of § 60 (b),[7] inoperative against the trustee.

This is undoubtedly the effect of a literal reading of the Act. Its apparent command is to test the effectiveness of a transfer, as against the trustee, by the standards which

---

[5] 52 Stat. 840, 842, 11 U. S. C. § 1 (30).

[6] *Phillips's Estate (No. 3)*, 205 Pa. 515, 55 A. 213; cf. *Phillips's Estate (No. 4)*, 205 Pa. 525, 55 A. 216. Pennsylvania has since provided by statute that notice of the assignment on the assignor's books will protect the assignee. Pa. Laws, 1941, No. 255, p. 606 (July 31, 1941), 69 Purd. Stat. Ann. § 561.

[7] 52 Stat. 840, 870, 11 U. S. C. § 96 (b).

applicable state law [8] would enforce against a good-faith purchaser. Only when such a purchaser is precluded from obtaining superior rights is the trustee so precluded. So long as the transaction is left open to possible intervening rights to such a purchaser, it is vulnerable to the intervening bankruptcy. By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law, although in fact made concurrently with the advance of money. In this case the transfers, good between the parties, had never been perfected as against good-faith purchasers by notice to the debtors as the law required, and so the conclusion follows from this reading of the Act that the petitioners lose their security under the preference prohibition of § 60 (b).

Such a construction is capable of harsh results,[9] and it is said that it will seriously hamper the business of "nonnotification financing," of which the present case is an instance. This business is of large magnitude and it is said to be of particular benefit to small and struggling borrow-

---

[8] Questions of this sort arising in bankruptcy cases were solved by reference to state law even before the decision of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64. *Holt* v. *Crucible Steel Co.*, 224 U. S. 262; *Benedict* v. *Ratner*, 268 U. S. 353. The decision in *Salem Trust Co.* v. *Manufacturers' Finance Co.*, 264 U. S. 182, that, as a matter of "general law," absence of notice to the debtor of the assignment of his account did not open the door to a subsequent assignee to obtain superior rights, was not rendered in a bankruptcy case, and is in any event inapplicable since the decision of the *Tompkins* case.

[9] Whether the petitioners have any rights under the agreement of some of the creditors to subordinate their claims to those which might be incurred for new working capital is a question which has neither been raised by the parties nor considered by the Court.

ers.[10]  Such consequences may, as petitioners argue, be serious, but we find nothing in Congressional policy which warrants taking this case out of the letter of the Act.

The Committee of the House of Representatives which reported § 60 (a) as quoted above was fully aware of the vicissitudes of its predecessors.[11]  These are recited in detail elsewhere, and need not be repeated here beyond a general statement that for thirty-five years Congress has consistently reached out to strike down secret transfers, and the courts have with equal consistency found its efforts faulty or insufficient to that end.[12]  Against such a

---

[10] Petitioners cite and rely upon Saulnier and Jacoby, Accounts Receivable Financing (National Bureau of Economic Research, 1943), for an estimate that in 1941 commercial finance companies advanced $536,000,000 on this basis; and commercial banks, $952,000,000. Of the borrowers, it was estimated that 63% had total (not net) assets of less than $200,000; and 31%, less than $50,000. Their borrowing was estimated, however, to amount to less than 19% of the total. *Id.* at 17, 32, 64.

"Factoring," a system involving notice to the trade debtors, and confined principally to the textile industry, amounted in 1941 to $1,150,000,000. *Id.* at 3, 17, 58 *et seq.*

[11] See statement of Professor McLaughlin, Hearings, Revision of the Bankruptcy Act, House Judiciary Committee, 75th Cong., 1st Sess., pp. 122–125.  He stated *Thompson* v. *Fairbanks,* 196 U. S. 516, as applying a rule of state law that a mortgagee by taking possession of the mortgaged property at a time subsequent to the execution of the mortgage thereby validated it as of the time of execution.  He said that § 60 (a) would prevent such validation by relation back. Similar disapproving reference was made to *Bailey* v. *Baker Ice Machine Co.,* 239 U. S. 268; *Carey* v. *Donohue,* 240 U. S. 430; and *Martin* v. *Commercial National Bank,* 245 U. S. 513; with the explanation that "You are going to have taken away some advantages that some people have enjoyed, and certain practices are going to be altered to some extent.  But you have that every time you pass any kind of a commercial law."

[12] See cases cited in the note above; *Hirschfeld* v. *Nogle,* 5 F. Supp. 234; 3 Collier on Bankruptcy (14th Ed.) §§ 60.05, 60.37.  The his-

background, § 60 (a) was drawn and reported to Congress with this explanation of its purpose and effect: "The new test is more comprehensive and accords with the contemplated purpose of striking down secret liens. It is provided that the transfer shall be deemed to have been made when it has become so far perfected that neither a bona-fide purchaser nor creditor could thereafter have acquired rights superior to those of the transferee. As thus drafted, it includes a failure to record and any other ground which could be asserted by a bona-fide purchaser or a creditor of the transferor, as against the transferee. A provision also has been added which makes the test effective even though the transfer may never have actually become perfected." [13]

Whatever advantages may inhere in non-notification financing which might have made Congress reluctant to jeopardize it, the system also has characteristics which make it impossible for us to conclude that it is to be distinguished from the secret liens Congress was admittedly trying to reach.

Receivables often are assigned only when credit in a similar amount is not available through other channels. [14]

---

tory and meaning of the present § 60 (a) are discussed in 3 Collier, *op. cit. supra,* § 60.48; 2 Glenn, Fraudulent Conveyances and Preferences (1940) § 534; Hanna, Some Unsolved Problems under Section 60A of the Bankruptcy Act, 43 Columbia Law Review 58; McLaughlin, Aspects of the Chandler Bill to Amend the Bankruptcy Act, 4 University of Chicago Law Review 369; Neuhoff, Assignment of Accounts Receivable as Affected by the Chandler Act, 34 Illinois Law Review 538; Mulder, Ambiguities in the Chandler Act, 89 University of Pennsylvania Law Review 10; Hamilton, The Effect of Section Sixty of the Bankruptcy Act upon Assignments of Accounts Receivable, 26 Virginia Law Review 168.

[13] H. R. Rep. No. 1409, 75th Cong., 1st Sess., p. 30.

[14] Saulnier and Jacoby, *op. cit. supra,* note 10, pp. 6, 21 *et seq.,* 61 *et seq.*

Interest and other charges are high,[15] and an assignment often is correctly understood as a symptom of financial distress.[16] The borrower does not wish his customers to learn of his borrowing arrangement for the reason, among others, that customers, particularly in placing orders for future delivery, prefer to rely on solvent suppliers. And often the borrower desires to conceal the fact that he is being financed by this method, lest knowledge lead to a withdrawal of further credit or refusal of new credit.[17] The borrower and the lender on assigned accounts receivable thus have a mutual interest in not making the transaction known. So long as the transaction may remain a secret, it is not apt to become known to the trade. When the transaction is communicated to the trade debtors it is known where there is less motive to keep it under cover. Commercial and trade reporting agencies are diligent to

---

[15] Effective rates are estimated to range from approximately 9% per annum on money in use for the best borrowers to 20% per annum for those whose accounts present the financing company with the heaviest operating costs and whose receivables are of a quality to command only a relatively low percentage advance. *Id.* at 86, 131 *et seq.*

[16] *Id.* at 22, 99.

[17] "Another reason for the use of the non-notification procedure, although less important than other motives and less relevant at present than formerly, seems to have been the desire on the part of the concern being financed to keep the fact of its use of this source of funds from becoming known to its creditors. Presumably these creditors would be less likely to grant the concern further credit on the ground that resort to accounts receivable financing reflected an unsatisfactory financial position and impaired their own security. It seems likely that this attitude toward non-notification financing may be traced to a mixture of simple prejudice and genuine experience with cases where creditors' meetings disclosed for the first time that the bankrupt had secretly assigned his most liquid assets and made unproductive use of the funds so acquired. Genuine experience must have been the more important basis of the two for it is unlikely that an attitude and prejudice so deeply embedded could be founded entirely on misinformation and irrational judgment." *Id.* at 22.

obtain credit information of this character. Its dissemination may often have adverse effects upon both the borrower and the lender, but they are not the only interested parties. Secrecy has the effect of inducing others to go along with the borrower in ignorance, where they would not do so if informed.

It is said that assignments such as are involved in this case could not have been within the contemplation of the Act, since its application will have but little effect in remedying whatever secrecy attends them. It is true that notice to the debtors sufficient to satisfy the requirements of applicable state law might never have been communicated to the creditors, and that many states do not require notice to the debtor to foreclose possible superior rights of subsequent assignees.[18] So also is it true that conflicts and confusion may result where the transaction or location of the parties is of such a nature that doubt arises as to which of different state laws is applicable. But the fact that the remedy may fall short in these respects does not justify denying it all effect.

That the assignments in this case were made with the knowledge and acquiescence of many creditors does not cure the failure to meet the requirements of notice laid down by the applicable state law. Neither the words nor the policy of § 60 (a) afford any warrant for creating exceptions to fit isolated hard cases.

The judgment below is

*Affirmed.*

MR. JUSTICE RUTLEDGE did not participate in the consideration or decision of this case.

MR. JUSTICE ROBERTS is of opinion that the judgment should be reversed for reasons stated in the dissenting

---

[18] See 2 Williston, Contracts (Rev. Ed.) § 435, and Hamilton, *loc. cit. supra,* note 12.

opinion below, 129 F. 2d 897, and in *Adams* v. *City Bank & Trust Co.*, 115 F. 2d 453; *Girand* v. *Kimbell Milling Co.*, 116 F. 2d 999, *In re Talbot Canning Corp.*, 35 F. Supp. 680; *Associated Seed Growers* v. *Geib*, 125 F. 2d 683, and *In re E. H. Webb Grocery Co.*, 32 F. Supp. 3.