William B. TYSON, Jr., as Trustee for Appliances, Inc., Bankrupt, Plaintiff,

v.

NATIONAL DISCOUNT CORPORATION, Defendant.

Civ. A. 4725.

United States District Court, E. D. South Carolina, Florence Division.

Feb. 20, 1957.

John M. Scott, Bernard G. Dusenbury, Florence, S. C., for plaintiff.

Bridges & Bridges, Florence, S. C., Roy A. Powell, Columbia, S. C., for defendant.

WILLIAMS, District Judge.

The Report of the Special Referee, Charles W. Muldrow, in the above case is as follows:

"This action was instituted in January, 1955, by the Trustee in Bankruptcy of Appliances, Inc., against the Defendant for an accounting by the Defendant for all assets of the bankrupt corporation taken by the Defendant during May of 1954, on the grounds that the acts of the Defendant set out in the Complaint constituted a preference of creditors under the bankrupt law and that it was a violation of the bulk sales law. By Answer the Defendant denied that there was a preference of creditors but alleged that the property taken by the Defendant was the property of the Defendant; that no creditor of the bankrupt had been misled; that the Defendant had not known of the bankrupt's financial condition and by way of counterclaim stated that cer-

tain moneys in hand of the receiver actually belonged to the Defendant.

"By consent of Counsel this matter was referred to me to take the testimony, determine the issues involved and report my findings of fact and conclusions of law. Pursuant to said Order, two references were held by me as follows: One on February 14, 1956, and the other on July 10, 1956. Minutes of said references and the testimony taken at same are being reported separately with this report.

### "Findings of Fact

"The records and testimony taken at the hearing in Florence before me shows that the Plaintiff had been duly appointed and qualified as Trustee for the Bankrupt who had been adjudged a bankrupt on June 25, 1954. The Bankrupt was incorporated in February, 1953, for Ten Thousand Dollars and Hugh Calhoun and Phil Stevenson were the only stockholders and officers of the Company, each owning one-half of the stock. Calhoun's wife was a dummy stockholder for Stevenson until the charter was granted. It was a retail business selling and handling electrical appliances in Florence with Calhoun, the President, Treasurer and Manager of the store. From the first the business made use of the defendant's services in financing its trade. On purchase of a large shipment of merchandise the wholesaler would deliver the merchandise to the bankrupt and then bill the defendant. The defendant would then prepare a note and mortgage covering the items purchased, forward this to the bankrupt for execution and mail the check to the wholesaler. All the mortgages given by the bankrupt to the defendant were given in this manner except one which was given as an additional security for past advances. These notes and mortgages would then be returned to the defendant without recording. This was the floor plan for financing some of the purchases, made by the bankrupt. On a retail sale on time, the mortgage signed by the purchaser, would be sent to the defendant, who would hold back ten per cent as a reserve and after deducting the amount due under the floor plan would send a check to the bankrupt for the balance. The bankrupt would then collect the installment payments and at first the floor plan was for the bankrupt to send checks on the 10th, 20th and 30th day of each month for the payments due even if they had not been collected. This lasted for three to five months but when the bankrupt got behind it was changed and payments would be made daily on collections actually made. That lasted until January of 1954. At that time the business "was getting shaky, it was financially unstable," and at the request of the defendant, who checked the records of the business and knew its condition, all collections made on merchandise it financed were deposited in a local bank in the defendant's name. It was about this time that stockholder Phil Stevenson sold his stock to Melvin Purvis, who not only bought his stock but endorsed a note for the bankrupt business at The South Carolina National Bank for a loan of Ten Thousand Dollars to give it operating capital. Calhoun's stock had also been financed by a loan through The South Carolina National Bank and the endorsement of Stevenson. When Stevenson sold his stock the defendant also took up Calhoun's note at the bank and held his stock as security. This was done in order to get Stevenson completely out. Calhoun was to pay this back in monthly installments. In addition to this the defendant also financed Calhoun's personal automobile and a deep freeze. The condition of the bankrupt continued to worsen and Purvis, who had telephone calls with the defendant about the bankrupt's condition, also realized its condition about March of 1954. In May of 1954, four of the officers and employees of the defendant with Melvin Purvis, walked in the place of business of the bankrupt at about lunch time and demanded payments due by the bankrupt and also on the notes on Calhoun's automobile, home freezer and stock certificate. The bankrupt Corporation was quite delinquent but Calhoun was only one month in ar-

rears on his personal notes. He paid the automobile but at their request signed releases on the other two items and also resigned as an officer of the bankrupt corporation. This took about two hours and he then left them in possession of the premises. At this time a good portion of the merchandise was under mortgage to the Defendant but enough of it was not to bring in over Two Thousand and No/100 Dollars ($2,000.00) at a public auction held by the receiver and there was also approximately Twenty-five and No/100 Dollars ($25) in the cash drawer. New locks and keys for the doors of the building were purchased. Although Mr. Purvis was with them when they came on the premises he testified that there was no meeting of the stockholders of the bankrupt corporation, no change in its officers, that he left the defendant officers on the premises when he left and that he had no keys. The testimony also shows that there had been no foreclosure of any of the chattel morgages or any other legal process. Purvis did not sign a release of the merchandise. The doors of the bankrupt were kept open for approximately three days, during which time the defendant's officers were in charge of the premises and at one time they interviewed a former employee of the bankrupt to see about the possibility of staying open for business.

"During this interval certain pieces of merchandise, which were not covered by chattel mortgages to the defendant, were allowed by the defendant to be removed by the wholesalers that had sold the merchandise to the bankrupt. In each instance the defendant required a receipt which was written out on stationery of the bankrupt in the possession of the defendant. There was no testimony of retail sales made during this interval but some payments on accounts receivable were made and accepted. An estimate of the value of the merchandise taken by the defendant was approximately Seventeen Thousand and No/100 Dollars ($17,-000). It was agreed between Counsel that the liability of the defendant, under the law should be determined before the exact value of the assets taken should be made. The defendant offered no testimony.

"The chattel mortgages given by the bankrupt to the defendant that were recorded in the records of Florence County are set out below:

| "Chattel Mortgage Book and Page Number | Amount | Date of Mortgage | Date of Recordation |
|---|---|---|---|
| EO Page 278 | $4,000.00 | 1–19–54 | 5–12–54 |
| EO Page 278 | 6,000.00 | 2–12–54 | 5–12–54 |
| EO Page 279 | 896.00 | 2–26–54 | 5–12–54 |
| EO Page 279 | 442.87 | 1–8–54 | 5–12–54 |
| EO Page 279 | 2,600.00 | 2–26–54 | 5–12–54 |
| EO Page 280 | 626.00 | 3–24–54 | 5–12–54 |
| EO Page 280 | 2,048.00 | 11–27–53 | 5–12–54 |
| EO Page 280 | 303.00 | | 5–12–54 |
| EO Page 304 | 2,988.00 | 2–12–54 | 5–12–54 |
| EO Page 317 | 1,500.00 | 7–7–53 | 5–17–54 |
| EO Page 317 | 475.20 | 11–13–53 | 5–15–54 |
| EO Page 322 | 2,693.00 | 12–7–53 | 5–15–54 |

"In the early part of June, 1954, through an action brought by the defendant, the bankrupt was thrown into receivership under the State Court and John Whisenhunt, Attorney of Florence, was appointed and qualified as receiver. On the adjudication of bankruptcy, Whisenhunt turned over all papers and assets of the bankrupt in his possession, to the Trustee in bankruptcy appointed by the Federal Court.

"On June 9, 1956, I served Counsel a Notice of Ruling wherein I ruled that the Defendant is responsible and liable as

**596**

alleged in the complaint of the Plaintiff and called for a reference to determine the valuation of the merchandise and equipment involved. A reference was set for Tuesday, July 10, 1956 at which Counsel for the parties agreed the value of the merchandise set out in Plaintiff's exhibit 1–Z to be *Eleven Thousand Eight Hundred Two and 46/100 ($11,802.46)* Dollars and Plaintiff's exhibit 'D' to be *Six Hundred and No/100 ($600.00)* ............Dollars.

## "Conclusions of Law

"The Plaintiff's Brief divided the argument into two (2) questions. The Defendant's Brief also used this division and I will report my conclusions in the same order.

## "Question I

" 'Whether The Transfer of Goods By a Bankrupt Before a Bankruptcy To a Chattel Mortgagee (Voluntarily Or Involuntarily) Can Be Voided As a Preference And a Constructive Fraud On The Other Creditors, When The Chattel Mortgages, Although Given Earlier, Were Recorded Within Four Months of The Adjudication Of Bankruptcy?'

■ "The elements of a voidable preference are (1) transfer of property of a debtor; (2) to a creditor on account of an antecedent debt; (3) debtor must have been insolvent at time of transfer; (4) bankruptcy must have occurred within four months; (5) advantage obtained over other creditors of same class; (6) reasonable cause on part of creditor to believe debtor insolvent. 6 Am.Jur. 1174.

■ "The transfer includes any transfer of property as payment or by way of security for a debt through any means. A transfer includes any parting of possession of property or the fixing of a lien upon property by or without judicial proceedings as a sale, assignment or mortgage, and must be a diminution of the estate of the debtor. Exchanges of property of equal value does not deplete the estate.

"Volume 6 of the Am.Jur.Prud. at page 1050 summarizes subdivision C of Section 70 of the Bankruptcy Acts as amended in 1938, 1950, and 1952 [11 U.S.C.A. § 110, sub. c]. Under this section the trustee for the bankrupt is given the status of the lien creditor even though he does not represent lien creditors. This statute was originally amended in 1910 and has been often called 'the strong arm clause.' Prior to this amendment the United States Supreme Court had decided that an adjudication in Bankruptcy was not the equivalent of a judgment, attachment, or other specific liens upon property of the bankrupt. This 1910 Amendment was enacted for the purpose of changing the prior rule laid down by the Supreme Court. In 1952 (July 7) it was amended to read as follows:

" 'The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of the bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists.'

■ "These sections, construed in the light of a decision which appears to have given the incentive to its enactment, enables a trustee to defeat unperfected, unrecorded, secret and undisclosed liens asserted against the property of the bankrupt, which neither the bankrupt nor any existing creditor of the bankrupt could have defeated before the amendment. The provision is, in effect, that the trustee shall have the same title to the property of the bankrupt in the custody of the Court that a creditor holding a lien by legal or equitable proceedings levied against the property would have under a State Law, and as to property not in custody of the Court, the trustee shall stand in the position of a judgment creditor holding an execution duly returned unsatisfied. The trustee is entitled to choose between his rights as a successor of the bankrupt and as a creditor holding a lien by legal or equitable proceedings or an execution. He is

entitled to assume the position most favorable to his contention as between possible creditors holding various kinds of liens by legal or equitable proceedings.

"The rights of the trustee were extended further and to include the four months period prior to the filing of the petition in bankruptcy when the Federal Bankruptcy Act was revised in 1938 by the adoption of what is familiarly known as the Chandler Act which provides in No. 60a, 11 U.S.C.A. § 96 subd. a, as follows:·

" 'A preference is a transfer as defined in this act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an *antecedent debt* made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, or of the original petition under chapter X, XI, XII or XIII of this Act the effect of which transfer will be to enable such creditor to obtain a greater per centage of his debt than some other creditor of the same class. For the purpose of subdivisions a and b of this section, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to the filing of the petition in bankruptcy or of the original petition under chapter X, XI, XII, or XIII of this Act, it should be deemed to have been made immediately before bankruptcy.'

"There had been considerable conflict among the courts as to the exact construction to be placed upon the term 'antecedent debt' as used in the above provision, but this conflict appears now to have been definitely determined by the Supreme Court of the United States in the case of Corn Exchange National Bank & Trust Co. v. Klauder [318 U.S. 434] 63 S.Ct. 679 [87 L.Ed. 884], 144 A. L.R. 1189. In that case it was held that a debt for a loan secured by assignment of accounts receivable, which was effective when made and was for a present consideration, was made 'antecedent' by a delay in giving notice of the assignments to the debtors whose obligations were assigned, which assignments were, by local law, inferior to the rights of a subsequent good faith assignee giving such notice, and that the assignments were preferences, and therefore were inoperative as to the assignor's trustees in bankruptcy, under the above provisions of the Chandler Act. The court in coming to this conclusion quoted from the report of the Committee of the House of Representatives in connection with this Amendment:

" 'The new test is more comprehensive and accords with the contemplated purpose of striking down secret liens. It is provided that the transfer shall be deemed to have been made when it has become so far perfected that neither a bona fide purchaser nor creditor could thereafter have acquired rights superior to those of the transferee. As thus drafted, it includes a failure to record and any other ground which could be asserted by a bona fide purchaser or a creditor of the transferor as against the transferee. A provision also has been added which makes the test effective even though the transfer may never have actually become perfected.'

"The Court then reasoned as follows:

" 'So long as the transaction may remain a secret, it is not apt to become known to the trade. When the transaction is communicated to the trade debtors it is known where there is less motive to keep it under cover. Commercial and Trade reporting agencies are diligent to obtain credit information of this character. Its dissemination may often have adverse effects upon both the

borrower and lender, but they are not the only interested parties. Secrecy has the effect of inducing others to go along with the borrower in ignorance when they would not do so if informed.'

"In the case of Johnson-Mass Co. (1939; D.C.Ref.) 45 Am.Bankr.Rep. (N. S.) (F) 32, the Referee stated:

" 'The effect of the above language would seem to be that although an assignment or other instrument of transfer is executed contemporaneously with the making of a loan, if the method or mode of transfer is such that some other creditor could thereafter have acquired any rights in the property transferred by way of security superior to the rights of the original lender, it shall be considered that the transfer was made immediately before bankruptcy, and hence, it must follow, that the transfer was made for or on account of an antecedent debt, and would therefore, be subject to being avoided by the trustee if the person receiving the transfer, at the time the transfer became effective, had reasonable cause to believe that the transferor was insolvent.'

"In the case of Brigman v. Covington, 4 Cir., 1915, 219 F. 500, 33 Am.Bankr. Rep. 644 a purchase-money chattel mortgage was recorded within the four months period prior to the bankruptcy of the mortgagor. The court said that it being the settled law in North Carolina that such a mortgage was not valid as against creditors until recorded, the legal effect of the transaction under review was the same as though the mortgage had been executed on the day on which it was recorded for that was the day it became effective.

"In Volume 5 of the South Carolina Code of Laws, Section 57–308 the statute reads as follows:

" 'Every agreement between the vendor and vendee or the bailor or bailee of personal property whereby the vendor or bailor shall reserve to himself any interest in the property shall be null and void as to subsequent creditors (whether lien creditors or simple contract creditors) or purchasers for a valuable consideration without notice unless such agreement be reduced to writing and recorded in the manner provided by law for the recording of mortgages.'

"In the case of Andrews v. Hurst, 163 S.C. 86, 161 S.E. 331 [334], a cow was levied upon for taxes due by the person who had it in possession. A third party claimed it as owner and brought suit against the tax collector. The jury found that Plaintiff, the third person, was the owner and found for Plaintiff. It was admitted that no agreement, as to ownership, had been recorded. The Court held:

" 'The very purpose of the statute is to protect those who deal with others who are in possession of personal property from claims of third persons who have nothing but oral proof of ownership. One in possession of personal property is presumed to be the owner of it. Any other rule would greatly hamper commerce and trade.

\* \* \* \* \* \*

" 'One who comes into the possession of property, so in the hands of a bailee, to which a lien has attached by contract with such bailee, or by operation of law, without notice of such bailment at or before the time such lien attaches, either verbal notice, or notice given by the record of a written agreement, is protected by the statute. And one who becomes a subsequent creditor of such bailee without notice of such agreement is likewise protected.

" 'It will thus be seen that the law, as it now stands, and as it stood when the agreement here in controversy was made, is no longer confined to *verbal* agreements, but extends to *every* agreement, and that it covers agreements between *bailor* and *bailee,* as well as those between

*vendor* and *vendee,* and that all such agreements must be reduced to writing, and recorded like mortgages, in order to make them valid against the claims of subsequent creditors, or purchasers for valuable consideration without notice.'

"In the case of Evans & Son v. Pendarvis, 124 ·S.C. 489, 117 S.E. 716, the court held that this State statute contemplates an agreement between bailor and bailee which can be recorded for otherwise the section has no application. In the case of Armour & Co. v. Ross, 75 S. C. 201, 55 S.E. 315 the Court held that this statute also applied to conditional sales contracts. From this it is quite apparent that the laws for the recording in South Carolina and the recording laws in North Carolina in this instance are the same and the ruling in the case of Brigman v. Covington, supra, would apply.

"The 1952 S.C.Code, Section 60–101 requires all deeds, mortgages, chattel mortgages and other instruments of a similar type to be recorded and states that there will be notice only:

" 'from the day and hour when they are recorded in the office of the registrar of mesne conveyances or clerk of court of the county in which the property affected is situated, * * *"

"This statute was interpreted in the case of Wardlaw v. Troy Oil Mill, 74 S.C. 368, 54 S.E. 658. In that case the Thompkins Company furnished machinery for the Troy Oil Mill under a contract which provided it should retain title to the machinery until payment of the purchase money. The contract was executed on May 17, 1904, but it was not recorded until December 9, 1904. The question was whether or not this was a first lien on the property as to intervening creditors. The lower Court held that the creditor could not assail or question the validity of the mortgage contract because it did not extend credit on the faith of the property but the Supreme Court reversed the lower court and held that proof that a subsequent creditor did not know of the existence of the property covered by an unrecorded mortgage does not protect the mortgagee under the statute as the statute makes no such exception in the protection afforded to subsequent creditors without notice.

██ "At the conclusion of the plaintiff's case the Defendant chose not to offer any testimony even though its officers and employees involved were present at the hearing. The law in South Carolina has been settled that if a party fails to produce testimony of an available witness on a material issue it may be inferred that his testimony if presented would be adverse to the party who fails to call the witness. Mickle v. Dixie Sec. Life Ins. Co., 216 S.C. 168, 57 S.E.2d 73. Also see Halliday v. United States, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711 which reversed 116 F.2d 812. These witnesses could have easily testified and denied, if true, that they had no knowledge of the financial condition of the bankrupt; that they did not take possession of the assets and business of the bankrupt; that there was no reasonable cause on the part of the defendant to believe that the bankrupt was insolvent; that there was no diminution of the estate of the bankrupt; and no advantage was obtained over other creditors of the same class. Their failure to take the stand and testify allows the Court to presume that their testimony would have confirmed the testimony of the Plaintiff on these and other points.

"Question 2

" 'Whether The Acts Of The Defendant, Through Its Officers Or Employees, Constituted a Transfer Or 'Sale,' Under The Bulk Sales Law of South Carolina, Making The Defendant Responsible For The Return Of The Said Assets Of The Said Bankrupt Taken By The Defendant Or Their Value?

██ "Counsel for Defendant admits that defendant has not complied with the South Carolina Bulk Sales Law, Code 1952, 11–201 to 11–206, but takes the position that under the facts it was not necessary for it to comply in that it only took possession of goods it had a right to

under its chattel mortgages. The facts stated supra refute this as no explanation has been made of the money in the cash drawer even though other items not covered by its mortgage were later turned over to the Trustee. The liability of the Defendant however would only be to the extent of the value of the property taken and as I have already found it responsible to that extent under Question I, I do not think it necessary to go any further under this question.

### "Summary

■ "From the records, the testimony taken, and the exhibits introduced, I find that the allegations of the Plaintiff's complaint are substantially true; that the Defendant has been guilty, under the Federal and State Laws of a voidable preference and that it is responsible to the Plaintiff for a true accounting of all merchandise and equipment that it took over from the Bankrupt, Appliances, Inc.

"By agreement of Counsel the value of the merchandise as of the date it was taken amounted to Eleven Thousand Eight Hundred Two and 46/100 Dollars ($11,802.46) and the equipment to Six Hundred and No/100 Dollars ($600) making a total of Twelve Thousand Four Hundred Two and 46/100 Dollars ($12,402.46). There was no recorded mortgage over these items prior to the four months before the adjudication of bankruptcy; therefore, the Defendant is responsible and liable for the full amount. There was no testimony of the ability of the Defendant to return the merchandise and equipment and if so, what would be its depreciation; therefore I recommend judgment against the Defendant in favor of the Plaintiff for the sum of Twelve Thousand Four Hundred Two and 46/100 Dollars ($12,402.46) plus the costs of this action."

This Report meets with my approval. It is therefore

Ordered that the Report of the Special Referee be adopted and made the judgment of this court.