W. T. MAYO, H. E. Harper and Jack Murrell, Trustees in Bankruptcy of Twin City Construction Company, Inc.

v.

PIONEER BANK & TRUST COMPANY.

Civ. A. No. 5516.

United States District Court
W. D. Louisiana,
Shreveport Division.

Dec. 29, 1960.

———◆———

Wilburn V. Lunn, Richard H. Switzer, Cleve Burton, Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for plaintiffs.

Turner B. Morgan, Morgan, Baker, Skeels, Middleton & Coleman, Shreveport, La., Paul M. Hebert, Breazeale, Sachse, Wilson & Hebert, Baton Rouge, La., for defendant.

BEN C. DAWKINS, Jr., Chief Judge.

Plaintiffs, as trustees in bankruptcy of Twin City Construction Company, brought this action to recover upon three separate monetary items alleged to have been unlawfully received by defendant from Twin City prior to the adjudication. All three claims, for $50,125, $9,000, and $10,020, originally were rejected by this Court.[1] The Court of Appeals affirmed as to the first and second claims but reversed and remanded, for further findings, as to the claim for $10,020.[2]

Briefly to recount the circumstances of the single claim remaining for decision, the Bank granted a loan of $10,000 to Twin City on December 29, 1955, concurrently secured by what was believed to be a valid pledge of the balance due on a Federal Government contract being performed at that time by Twin City at Blytheville, Arkansas. The Government was not notified of this pledge agreement. Twelve days later, on January 10, 1956, Twin City received a check from the Government for $11,693.18 as a percentage completion payment on the contract. On the same day W. A. Gray, president and sole stockholder of Twin City, deposited the check in Twin City's account in the Bank. He then instructed the Bank to enter a debit memorandum for $10,020 against the account in payment of the $10,000 loan, which was effected that same day. Within four months thereafter, on April 21, 1956, Twin City was adjudicated a bankrupt.

We rejected the contention of the trustees that payment of the $10,000 loan constituted a preference under the Bankruptcy Act, § 60, sub. a, 11 U.S.C.A. § 96, sub. a, because we considered that one of the six necessary elements of a preference was missing, viz., that the transfer of the debtor's property must have been made in payment of an antecedent debt. We held that repayment of the loan within twenty-one days perfected the pledge, as permitted by Section 60, sub. a(7) of the Bankruptcy Act; hence the pledge should be treated as though it had been perfected when originally executed, and, therefore, that there had been no transfer for an antecedent debt, and no voidable preference. We also

1. 168 F.Supp. 503.

2. 5 Cir., 270 F.2d 823; rehearing denied 274 F.2d 320.

held that, in any event, the Bank was entitled to offset the amount of the deposit against the note.

The Court of Appeals ruled that the purpose of the 1950 amendment to Section 60, sub. a(7), 11 U.S.C.A. § 96, sub. a, was to alleviate the harshness of the rule in the Klauder case, Corn Exchange Nat. Bank, etc. v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884 by allowing perfection of a lien within twenty-one days, *provided* the State law regarding the method of perfecting such liens is followed. Turning to Louisiana law, the Court held that payment of the loan within twenty-one days did not operate to perfect the lien because the necessary notice was not given to the debtor— the Government—as required by LSA–C.C. 3158 and 3160.

Hence the Court of Appeals found that one of the elements necessary to establish a preference under Section 96, sub. a, was present, in that the payment by debit memorandum was a transfer for an antecedent debt. The Court also held that the purpose of the deposit, made on January 10, 1956, was for payment of the debt, and, on the authority of the Cusick case, Cusick v. Second Nat. Bank, 73 App.D.C. 16, 115 F.2d 150, the trustees could attack the set-off as a voidable preference if: 1) either the company or the Bank intended the deposit to operate as payment of the debt, rather than as an ordinary deposit; 2) at the time of the deposit the depositor was in fact insolvent; *and* 3) the Bank had reasonable cause to believe the company was insolvent at that time.

The case has been remanded to this Court to determine if the other elements of a preference actually were present and, if so, whether it is voidable under Section 96, sub. b. If all such elements were present, plaintiffs still cannot set aside the preferential payment unless they can prove that, under that section, the Bank had "reasonable cause" to believe Twin City was insolvent on the date of the transfer.

The Bank now contends that judgment should be given for it because: (1) plaintiffs have not conclusively proven that Twin City was insolvent on the date of transfer, January 10, 1956, as required under Section 96, sub a; and, (2) that plaintiffs have not proven that the Bank had reasonable cause to believe on January 10, 1956, that Twin City was insolvent, under Section 96, sub. b.

Plaintiffs, on the other hand, contend that all conditions precedent to the establishment of a voidable preference under Section 96, subs. a and b, have been proven, and they move for a summary judgment.

Upon remand, a further hearing was had at which the Bank presented additional testimony, but plaintiffs stood on the record as previously made. The questions presented for decision are purely factual, the law being well settled.

Upon further consideration of the record, we believe that Twin City was in fact insolvent on January 10, 1956. This conclusion is partly based on the fact that at the original trial of this case Twin City was shown to have had unsecured claims in the amount of $71,045.32, taxes owing in the amount of $4,531.38, and assets of only $91.14. There is no evidence to show that Twin City acquired any assets after January 10, 1956, or that it incurred any new liabilities. Moreover, the income tax file, Exhibit P–26, contains a comparative balance sheet which shows that for the period ending on September 30, 1956, Twin City had a total net worth deficit of $19,170.84. A year earlier the company had shown a surplus of $53,323.60.

Our conclusion is further bolstered by the opinion of A. P. Petty, secretary-treasurer and accountant for Twin City, who testified that Twin City was insolvent on that date.[3] Petty's testimony is

3. Record, pp. 260–261:
"Q. I ask you, in line of that definition, was the Twin City Construction Company insolvent at the following times; December 15, 1955, at the time of the transfer of four thousand dollars to the W. A. Gray Construction Company; on December 29, 1955, at the

entitled to considerable weight, he having been in charge of all accounting for Gray and his companies since March 16, 1946, and, therefore, being thoroughly familiar with their financial condition.

R. J. Hughes, a certified public accountant employed by Newark Insurance Company to determine Newark's liabilities under its bond for W. A. Gray Construction Company, testified that his cursory examination of Twin City's books revealed that it had a deficit of $31,762.68, as of December 31, 1955. We felt at the time that the facts before him were too meager to serve as the basis of a valid opinion, and he admitted that an audit would have to be conducted to conclude definitely that Twin City was insolvent. However, he stated that if the entries in the general ledger were "honest" an audit was not necessary. We still feel that Hughes's testimony should not be entitled to any weight in this respect, and it is not accorded any.

We are also convinced of Twin City's insolvency on the date in question by the fact that Gray personally was insolvent. It has been conclusively established that he was in financial ruin as of January 3, 1956. Having observed his virtual wizardry in overcoming and concealing his earlier financial straits so as to completely hide any evidence of insolvency, not only from his principal bonding company, but also his banker, it safely can be assumed that Gray readily would have used any assets of Twin City to continue his ruse, if such were available.

The Bank argues that the $10,020 paid by Twin City on January 10, 1956, must be considered as an asset in determining the debtor's insolvency as of the date of payment, citing Collier, Bankruptcy Manual, para. 60.09 and para. 1.09. We do not believe that this sum would materially affect Twin City's insolvency in the light of the other evidence and testimony. Based on the liabilities and assets at the time of trial Twin City still would have had at least a $65,000 deficit, or a $9,000 deficit based on the comparative balance sheet prepared for its income tax return.

Defendant also contends that we must take into consideration the sum of $33,715.79 for which the trustees have sued in the Court of Claims as being owed to Twin City by the Government on the Blytheville contract. However, on January 10, 1956, the contract had not been fully completed and this sum was not then owing. Moreover, it might be found by that Court to be not owed at all. We cannot consider that amount as an asset in determining the solvency of Twin City on that date.

The Bank further points to the Findings of Fact as made originally by this Court wherein we stated that, with respect to the $9,000 claim, the insolvency of Twin City as of December 29, 1955, had not been conclusively established. The defendant argues that its condition was legally and factually the same twelve days later on January 10, 1956.

Our conclusion is not altered by this argument. A cursory examination of Twin City's bank statement from December 29, 1955, to January 10, 1956, reveals that checks were drawn against its account during this period for a total of $4,185.68. The only deposits for that interval were the $10,000 borrowed from the Bank on December 29, 1955, and the check for $11,693.18 from which the debit memorandum for $10,020 was drawn. In total, the bank account contained $2,853.87 on December 29, 1955, and only $389.85 on January 10, 1956. This is a decrease in assets of $2,464.02 for that twelve-day period. For a company as thin as Twin City, this is an appreciable change. Taking into ac-

time of the transfer to W. A. Gray Construction Company of nine thousand dollars, and January 10, 1956, at the time of the transfer to the Pioneer Bank of ten thousand and twenty dollars? "A. By the same token, if Mr. Gray's

190 F.Supp.—10½

accounts receivable was no good, then the company was insolvent. "The Court: You have already said he was insolvent from 1951 on. "The Witness: Yes, sir, so they were insolvent."

count the other evidence, and in particular the testimony of Petty, we are convinced that insolvency as of January 10, 1956, has been proven.

Defendant strongly relies upon several articles of the Louisiana Civil Code in support of its contention that it was a secured creditor, in the belief that the Court of Appeals ruled that if it could prove, upon remand, either 1) that it was a secured creditor or 2) that it had no reasonable cause to believe at the time of payment that Twin City was insolvent, then judgment must be given in favor of the Bank. We have read and re-read the appellate Court's opinion and nowhere in it do we find any language to support the Bank's first premise, as just stated. What and all that Court held was that, for want of notice to the Government, the Bank did not have a valid pledge under Louisiana law on the proceeds of the Blytheville contract and, therefore, the payment on January 10, 1956, was for an antecedent debt; and that the trustees could attack the Bank's claim to an offset, since the deposit of January 10, 1956, was made for the purpose of paying Twin City's note of December 29, 1955. The case was remanded to this Court to determine whether, under the facts, any other elements of a preference were lacking, and if all were found to be present, then we should determine, as urged by defendant in its second premise, whether the Bank had reasonable cause to believe that Twin City was insolvent.

If we are in error, however, in our interpretation of that decision, we believe that defendant's present arguments to the effect that it was a secured creditor must fall because they are premised on the assumption that it had a valid "pledge." Its first point is that under LSA–C.C. Art. 3144,[4] when Twin City received the proceeds of the Blytheville contract, the pledge agreement was perfected and this perfection related back to December 29, 1955, when the attempted pledge was initially made. The second point is that Twin City acted in a fiduciary capacity in receiving the proceeds and delivering them to the Bank, and, therefore, possession of these proceeds by Twin City did not invalidate the pledge.[5] The third point is that the pledgee enjoys not only a privilege upon the thing pledged but also the possession of the thing until the debt is paid.[6] Each of these three arguments fails to consider that the Court of Appeals held that the pledge was not, and could not have been, perfected because of lack of notice to the debtor on the contract—the Government—as required by Louisiana law.

Defendant's fourth point, on its face, appears to be more plausible. This argument is that in granting to the Bank the right to offset the amount due against any account maintained in the Bank, Twin City thereby granted a "pledge" to the Bank of its bank account, citing as authority American Bank & Trust Co. v. Morris, 5 Cir., 16 F.2d 845, 847. However, a careful reading of that case reveals that it is not authority for the proposition urged by defendant. The Court in the Morris case stated:

"There is no doubt that the general rule is that a bank has the right to set off a deposit made in the usual course of business against loans to the depositor, at maturity or in case of his insolvency, and may do so even in the event of bankruptcy. In re Cross (C.C.A.) 273 F. 39; Wright v. Seaboard Steel & Manganese Corp. (C.C.A.) 272 F. 807; Walsh v. First National Bank

---

4. *"Subsequent acquisition of ownership of thing pledged*
   *"Art. 3144.* If at the time of the contract the debtor had not the ownership of the thing pledged, but has acquired it since, by what title soever, his ownership shall relate back to the time of the contract, and the pledge shall stand good."

5. Citing as authority, Scott v. Corkern, 231 La. 368, 91 So.2d 569.

6. Citing Webre v. Beltram, 47 La.Ann. 195, 16 So. 860; Renshaw v. His Creditors, 40 La.Ann. 37, 3 So. 403.

(C.C.A.) 201 F. 522; Durkee v. National Bank of Florida (C.C.A.) 102 F. 845.

"If it be conceded that under the law of Louisiana it is necessary that a depositor enter into an agreement to that effect before a bank may appropriate his deposits to the payment of his loans, which some of the decisions seem to indicate, there is nothing in the law that would prevent him from agreeing in advance, at the time of negotiating a loan, that it be secured by money then on deposit, or to be deposited in the future, nor from also agreeing that any collateral then pledged to the bank should be also pledged to secure the additional loan. In this case the stipulations contained in the notes, as above set out, constitute such an agreement."

Turning to the notes involved in that case, they read:

" 'The securities pledged with this note are also pledged to secure any other obligation of the maker or makers due or hereafter to become due to the American Bank & Trust Company, or the holder of this note.

" 'At or after the maturity of this note, or when same becomes due under any of the provisions hereof, any *money*, stocks, bonds *or other property* of any kind whatsoever, *on deposit or otherwise to the credit of the maker*, indorsers, guarantors, or sureties on the books of the American Bank & Trust Company, or the then holder of this note, in transit or in their possession, *may*, without notice, *be applied* at the discretion of said American Bank & Trust Company, or said holder *to the full or partial payment of this note.' "  (Emphasis supplied.)

Thus, it can be seen that in Morris the *securities* were *pledged* to secure all the obligations of the maker and *in addition* the bank was given the right to *offset* any amount due on the notes against any "money" or any "property of any kind" owned by the maker and on deposit in the bank. There is nothing in the facts or ruling of that case to show that the bank had a *"pledge"* on the deposits; rather the case holds that the bank has the *privilege* of set-off which can be given by the debtor in the note itself. The pledge of the securities is found in a separate paragraph from that paragraph giving the bank the privilege of set-off. In essence, the bank had two security devices in its legal arsenal. It had a pledge of certain securities and it also had the privilege of set-off. However, the privileges of pledge and set-off are two separate legal concepts and the bank did not have a pledge on the deposits which were subject to the privilege of set-off.

Here, as noted, the Court of Appeals has recognized the general *privilege* of the Bank to offset Twin City's indebtedness against its deposits, *provided* the deposit was not made solely to repay the loan. If that was done, however, as the Court found expressly, then the trustees may set aside the transfer, as a voidable preference, if they also can prove that Twin City was insolvent (which we now have found affirmatively) *and* that the Bank had "reasonable cause" to believe that Twin City was insolvent.

We are convinced that all elements of a preference under Section 96, sub. a, are present: 1) There was a transfer of the debtor's property within the meaning of 11 U.S.C.A. § 1 in that the debtor's property was disposed of by way of a debit memorandum which repaid the $10,000 loan. 2) A creditor, the Bank, was benefited by that payment. 3) The transfer was on account of an antecedent debt, and 4) was made while the debtor, Twin City, was insolvent. 5) The transfer occurred within four months of bankruptcy, having been effected on January 10, 1956, and the adjudication in bankruptcy occurring on April 21, 1956. 6) The Bank obtained a greater percentage of its debt as a result of the transfer because it received 100% of Twin City's debt, whereas other

creditors with claims totaling $71,045.52 must share only $91.14 in assets.

This brings us finally, therefore, to the important and controlling question of whether the Bank had "reasonable cause," on January 10, 1956, to believe that Twin City was insolvent.

Although this is a factual question, we must be guided by the rules laid down by the Supreme Court, for judging such matters, in Grant v. First National Bank, 97 U.S. 80, 24 L.Ed. 971:

" \* \* \* It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it,—and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know any thing of his embarrassments, either participate in the same feeling, or as least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided.

"Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man." [7]

Thus, we are charged with determining whether the Bank had a "well-grounded belief" that Twin City was insolvent, based on "some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man." Considering the evidence and testimony as a whole, we are firmly convinced that this question must be resolved in favor of the Bank.

E. R. Campbell, president of the Bank since its founding in 1945, personally handled all loans made to W. A. Gray. He had extended loans to Gray for twenty years and the Bank itself had done so since it was established, more than ten years before the subject matter of this litigation took place. Between January 1, 1950, and July 28, 1955, the

---

7. See also, Miller v. Martin, D.C.Pa., 17 F.2d 291; In re Klein-Moffett Co., D.C. Md., 28 F.2d 523; Cusick v. Second National Bank, 73 App.D.C. 16, 115 F.2d 150.

Bank had executed 399 loans, or renewals of loans, to Gray, totaling $4,-634,603.37. Prior to January of 1956, the Bank had not sustained a single loss on any loan made to Gray. In light of this large amount of credit extended to Gray, and repaid, it is quite understandable that Campbell had utmost confidence in Gray's personal integrity and credibility.

On January 3, 1956, Gray told Campbell that he was financially unsound and was "throwing up his hands." At that time Campbell neglected to inquire of Gray as to the solvency of Twin City because Campbell's father was critically ill, causing him to be in an emotionally upset condition. However, on January 4th or 5th, Campbell again talked with Gray and asked him about the condition of Twin City. *Gray told him that Twin City was solvent and would continue to operate.* In this connection, plaintiffs contend that since Campbell knew that Twin City was only Gray in corporate form, and since he also knew that Gray was insolvent, then the Bank is charged with knowledge of the insolvency of Twin City. We do not believe that this inference properly or fairly can be drawn. We are concerned with what the Bank, through its president, actually believed at that time and whether it was reasonable in its belief; we are not concerned with what subsequently has been proven as a matter of fact. Based on Campbell's past successful dealings with Gray, it was not unreasonable for Campbell to believe that Gray was telling the truth. At most only a suspicion was created which would require Campbell to investigate further.[8] He admitted that he did not have any certified public accountants conduct an audit of Twin City's books, and we do not believe that such an investigation was necessary, in view of Campbell's faith in Gray's integrity. Campbell did talk to various suppliers as they came in the Bank and they did not tell him anything to alarm him as to Twin City's financial condition.

Campbell knew the Blytheville contract was 99% complete on December 29, 1955, and he thought that the Bank had a valid pledge of the remaining proceeds of this contract, amounting to over $43,000, as security for the $10,000 loan. Any fears he may have had were further allayed when Gray brought in the Government check for $11,693.18. The Bank prepared assignments of claims for loans made to Gray personally after learning of his financial plight on January 3, 1956, but did not do so with respect to the loan made to Twin City. If any reason existed for believing that Twin City was insolvent, it is more reasonable to assume that the Bank also would have drawn up an assignment of claim for its loan. Moreover, the earliest claim presented to the bonding company on the Blytheville contract was dated January 11, 1956. Campbell's belief in the solvency of Twin City is further shown by his testimony, and that of Lester C. Haas, architect for the Bank's proposed branch office at that time, to the effect that Campbell told Haas as late as February 28, 1956, that the Bank was considering Twin City to serve as the contractor on the project.

We cannot help but comment that this Court has spent a considerable amount of time attempting to determine whether Twin City was actually insolvent on January 10, 1956, by studying all of its records and the opinions of certified public accountants. Considering Campbell's not unwarranted trust in Gray's honesty and the other surrounding circumstances, it is understandable that the Bank had no reasonable cause to believe that which we have determined to be a fact only after extended study.

Having failed to prove that the preference was voidable under Section 60, sub. b, of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. b, for the reasons stated herein, judgment rejecting plaintiffs' demands must be rendered.

A proper decree should be presented after notice.

8. Lang v. First National Bank in Houston, 5 Cir., 215 F.2d 118.