# 𝔖taunton

## UNIVERSAL CREDIT COMPANY, A CORPORATION v. BOTETOURT MOTOR COMPANY, INCORPORATED, ET AL.

September 9, 1942.

Record No. 2532.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Eggleston, JJ.

The opinion states the case.

*Fred B. Gentry* and *Harvey B. Apperson*, for the appellant.

*F. A. Lewey* and *J. W. C. Johnson*, for the appellees.

HUDGINS, J., delivered the opinion of the court.

On August 11, 1939, the Universal Credit Company instituted an action in detinue against the Botetourt Motor Company, Incorporated, to obtain possession of seven new Ford automobiles and three used automobiles, and gave bond in the penalty of $10,000, conditioned as the law directs. The property was seized by the sheriff and delivered to the plaintiff, which sold it without an order of court. On October 5, 1939, the case was transferred to the chancery side of the court. The Universal Credit Company on that day filed an appropriate bill claiming title to the seven new

cars, under conditional sales contracts, and liens under chattel mortgages on the three used cars, and prayed that the titles to the new cars and the liens on the used cars might be established and enforced in the suit. The Botetourt Motor Company, Inc., was adjudicated a bankrupt on the 21st day of August, 1939, and A. G. Simmons was duly elected trustee for the bankrupt. This trustee filed an answer to the bill alleging that the ten automobiles in question were the property of the Botetourt Motor Company, Inc., and were free of liens at the time the petition in bankruptcy was filed. The Standard Finance Corporation filed its answer claiming an interest in the property by virtue of certain trust receipts executed by the Botetourt Motor Company, Inc., on some of the cars, and as creditor of the bankrupt. From an adverse decree the Universal Credit Company obtained this appeal.

On January 7, 1939, the Botetourt Motor Company, Inc., executed what is termed a "dealer's wholesale underlying agreement," whereby title to all automobiles, to be delivered to the Botetourt Motor Company, Inc., by the Ford Motor Company, should be retained by the vendor until the purchase price was paid in full. The pertinent provisions of this agreement were as follows:

"That the following provisions shall be and are hereby incorporated in and by reference become a part of every Conditional Sale Contract, Trust Receipt or other lien instrument executed by undersigned and purchased by you under which motor vehicles are delivered to undersigned.

"Undersigned agrees to keep said property free of all taxes, liens and encumbrances and not to use and operate the same for demonstration or otherwise; * * * ; that undersigned shall not sell, loan, pledge, mortgage or otherwise dispose of said motor vehicles, or transfer any interest therein, except as provided herein; that if any of said motor vehicles are sold and otherwise disposed of before the amount due thereon is paid, the proceeds thereof must be immediately paid over or held in trust separate from undersigned's own funds.

"Time is of the essence of this agreement, and in the event of default in payment or failure to comply with any provision hereof, or a proceeding in bankruptcy, receivership, or insolvency be instituted by or against undersigned or undersigned's property, or you deem yourself insecure, or if any obligation of undersigned to you is in default, for any reason whatsoever, this agreement shall be deemed in default and the full amount shall immediately become due and payable; upon any such default, you or any officer of the law, may take immediate possession of said property without legal process, without demand (possession after default being unlawful) and for this purpose enter upon the premises where said property may be and remove same."

When the motor vehicles were delivered, each was accurately described on the face of an invoice, on the back of which, signed by the parties, was the following addition to the contract:

"Undersigned Seller hereby sells and undersigned Buyer hereby purchases on a time price basis the property described on the reverse side hereof, receipt of which is hereby acknowledged, the deferred balance of purchase price being the amount shown on the reverse side hereof in space marked 'Amt. Due Each Car' which Buyer promises to pay to the order of Seller ninety (90) days after date, with interest thereon after maturity at the rate of six per cent per annum. Title to said property shall not pass to Buyer until the amount due hereunder is fully paid in cash. Time is of the essence of this contract and if Buyer defaults in payment or otherwise, the entire amount shall become immediately due and payable and Seller may repossess the said property or bring suit for the amount due hereunder. Buyer admits notice of the intended assignment of this contract, acknowledges receipt of a true and correct copy thereof, and agrees that all the provisions of any underlying agreement between Buyer and the assignee hereof shall as between Buyer and assignee, become part of this contract as though set out verbatim herein."

Under the terms of this agreement the Ford Motor Company delivered to the Botetourt Motor Company, Inc., seven cars at the wholesale price of $4,215.21. On delivery the Botetourt Motor Company, Inc., paid the Ford Motor Company ten per cent. of the wholesale price, plus a few dollars for extras, and executed the conditional sale contract for every car. Each of the seven sales contracts were returned to the Ford Motor Company and by it assigned to the Universal Credit Company for the sum of $3,790. One of these contracts was executed on May 26th, two on June 7th, three on July 27th and one on July 28, 1939.

On July 29, 1939, the Botetourt Motor Company, Inc., at the request of the Universal Credit Company, applied to the Motor Vehicle Commissioner for a certificate of title for each of the automobiles. Two days later, on July 31, 1939, certificates of title were issued, each containing a proper notation of the amount due the Universal Credit Company.

On August 11, 1939, the sheriff, armed with an order of court in the action of detinue, seized the automobiles and delivered them to the Universal Credit Company.

The dominant question presented is whether the transfers of the automobiles, under the circumstances stated, created a voidable preference within the meaning of section 60 (a) and (b) of the Bankruptcy Act, as amended in 1938.

We turn to the contract and the action of the immediate parties thereto to ascertain their rights thereunder before application was made to the Motor Vehicle Commissioner for certificates of title.

The Botetourt Motor Company, Inc., was a retail merchant or "trader" engaged, in its own name, in the business of buying and selling motor vehicles. Under the terms of the agreement, it acquired the possession of the motor vehicles, with the right to exhibit them as a part of its stock of merchandise. It had the right to sell the vehicles, as agent or trustee, and account to the Ford Motor Company, as principal, for the major part of the retail price received. The Botetourt Motor Company, Inc., acquired no right to

operate or to use the motor vehicles in any other way. It could not encumber or create a lien upon them.

The Ford Motor Company, a manufacturer, reserved the titles to its manufactured products, with the right to repossess them immediately upon the failure of the Botetourt Motor Company, Inc., to perform any one of the covenants set forth. The situation of the parties under the agreement is practically the same as if the property of the Ford Motor Company had been consigned to the Botetourt Motor Company, Inc., a merchant, for sale and accounting. See "Creditors' Rights and the Virginia Traders Act," 27 V. L. R. 962, *et seq.*

The effect of the contracts is to bring the parties within the provisions of Code, sec. 5224, known as the Traders Act. While the Botetourt Motor Company, Inc., a retail merchant, agreed to act as agent in the sale and accounting of the property delivered to its possession, it failed to publish and disclose by proper signs the name of its principal. The pertinent part of this section reads: " * * *; if any person transact such business (as a trader) in his own name, without any such addition; all the property, stock, and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of such person."

In *Edmunds* v. *Hobbie Piano Co.*, 97 Va. 588, 34 S. E. 472, the facts were that the Hobbie Piano Company, under a retail merchant's license, was engaged in the business of buying and selling musical instruments. Four manufacturers or wholesale distributors of instruments delivered three pianos and two organs to the Hobbie Piano Company for sale under written contracts which were not recorded. These musical instruments were exhibited for sale in the store of the Hobbie Piano Company as a part of its stock of merchandise. The sheriff levied upon the stock, the office furniture and three other organs owned by other parties. This court held that the office furniture and the three organs, which were left with the Hobbie Piano Company for safekeeping and not for sale, were not liable to the levy, but

that the pianos and organs consigned to the Hobbie Piano Company for sale were liable to the execution under the provisions of section 2877 of the Code of 1887, now section 5224 of the Code of 1936.

Judge Parker of the Circuit Court of Appeals for the Fourth Circuit, in the cases of *Southern Dairies* v. *Cooper*, 35 F. (2d) 439, 442, referring to the *Hobbie Piano Company case*, said: "This case, while holding that the act (sec. 5224) applies in the case of a trader doing business for himself and in his own name, limits its application to property of others used in the business in the sense of possessed with power of sale. * * * . The statute applies logically in the case of goods belonging to another which are held for sale by a merchant who otherwise is doing business for himself in his own name, * * * ; for as to such goods the merchant is the agent of the owner for the purpose of making sale, and the owner is an undisclosed principal within the meaning of the statute."

While the language used in the contract involved in the case of *Capitol Motor Corp.* v. *Lasker*, 138 Va. 630, 123 S. E. 376, is different from the language of the contracts involved in the case now under consideration, the purpose and object of the two forms of contracts are the same. In each case the vendee was engaged in the business of buying and selling automobiles in its own name. The vendee acquired the possession of the motor vehicles, the right to exhibit the same in the show rooms, to sell them, and to account to the vendor, as principal, for the greater part of the proceeds. At the time of delivery a percentage of the wholesale purchase price was paid, the vendee executed obligations evidencing the balance of the unpaid wholesale purchase price and agreed that, upon the breach or violation of any of the covenants set forth, the motor vehicles should be immediately surrendered to the vendors.

In the *Lasker case*, Judge Campbell, now Chief Justice, speaking for the court, said: " * * * , we are of the opinion that a proper construction of the 'traders act' (section 5224), is that the act is applicable only to property,

stock, etc., used in the business of the trader, *i. e.*, property, stock, etc., which constitutes, in whole or in part, the apparent assets of the business of the trader, *at the time in question;* and that the creditors who are entitled to claim the benefit of such act *are lien creditors only*, or some representative of theirs, such as their trustee, and that whether the lien be obtained by deed of trust, execution, or otherwise, is immaterial." (Part of italics supplied.)

Six of the automobiles in controversy in the above case were seized under the provisions of an unrecorded contract prior to the execution and recordation of a deed of assignment conveying all the property, including the automobiles in question, to a trustee for the benefit of creditors. Two of the automobiles were seized under the same contract after the execution and recordation of the deed of assignment. It was held that the conditional sales vendor, or consignor, was entitled to the cars seized before the recordation of the deed of assignment, but that such vendor, or consignor, was not entitled to the cars seized after the assignment.

On August 11, 1939, when the Universal Credit Company seized the seven automobiles, there were no lien creditors of the Botetourt Motor Company, Inc. The adjudication in bankruptcy was rendered on August 21, 1939, ten days after the motor vehicles had been repossessed by legal process under the terms of contract.

The facts in the case now under consideration are strikingly similar to the facts in the case of *Finance, etc., Co.* v. *Oppenhimer*, 276 U. S. 10, 48 S. Ct. 209, 72 L. Ed. 443. Mr. Justice Holmes, in delivering the opinion in that case, said: "This is a suit brought by the respondent, trustee in bankruptcy for W. A. Lee, to recover the value of four automobiles seized by the defendant, the petitioner, in circumstances alleged to have made the taking a preference if maintained. The defendant sold the automobiles to the bankrupt by a duly recorded contract of conditional sale. On January 10, 1921, it repossessed itself of the cars by a suit in detinue. Ten days later, on January 20, the petition

in bankruptcy was filed against Lee, and on February 25, he was adjudicated a bankrupt. About a year later the trustee brought this suit relying upon the Traders' Act, sec. 5224 of the Code of Virginia, by which, it may be assumed, all the property used by Lee in his business, including these cars, 'shall as to the creditors of any such person, be liable for the debts of such person.' The trustee prevailed in the Circuit Court of Appeals. * * * .

"We are of opinion that the decision was wrong for the reason given by the dissenting judge below. The Supreme Court of Appeals of Virginia has construed the Traders' Act and has established that 'the creditors' in sec. 5224 means creditors having a lien. *Capitol Motor Corporation* v. *Lasker*, 138 Va. 630. The lien of the trustee in bankruptcy did not arise until after the property in question had come back to the hands of the petitioner, which had reserved title to itself. *Bailey* v. *Baker Ice Machine Co.*, 239 U. S. 268, 270. *Martin* v. *Commercial National Bank*, 245 U. S. 513, 517, Bankruptcy Act, sec. 47(a) (2) as amended. U. S. C., Title 11, sec. 75. Therefore the retaking of the property was valid as against the trustee. It could not work a preference unless he represented a claim that was paramount when the property was seized. At that time the petitioner did what it had a right to do as against the bankrupt and simply took what was its own. It did no wrong to any creditor, for no creditor not having a judgment or other lien could have complained so far as the law of Virginia went. See *Firestone Tire & Rubber Co.* v. *Cross*, 17 F. (2d) 417, 421, 422."

Since 1924, when the opinion in *Capitol Motor Corp.* v. *Lasker, supra,* was announced, it has been consistently held that the word "creditors," as used in the Traders' Act, means lien creditors. See *Seventh St. Garage Co.* v. *Mercer*, 150 Va. 269, 142 S. E. 350; *Seaboard Citizens' Nat. Bk.* v. *Spandorfer*, 160 Va. 826, 170 S. E. 12; *Midland Inv. Corp.* v. *May*, 104 W. Va. 289, 140 S. E. 5; Note in 124 A. L. R. 175; Glenn on Fraudulent Conveyances and Preferences, Revised, Vol. Two, sec. 539.

It is contended that the Traders' Act (sec. 5224) is not applicable because sec. 2154 (64) expressly excludes automobiles from the application of its provisions.

The exact language of the statute relied upon is: "Motor vehicles, * * * *registered* or for which a *certificate of title shall have been issued under this act* shall not be subjected to, but shall be exempt from the provisions of sections fifty-one hundred and eighty-nine and fifty-two hundred and twenty-four of the Code of Virginia, as amended, nor shall recordation of such lien in any other place for any other purpose be required and shall have no effect." (Italics supplied.)

It will be noted that the language expressly excludes motor vehicles *registered* with the Motor Vehicle Commissioner. At the time that the contracts were executed none of the motor vehicles in question had been registered. The provision requiring registration is found in section 2154(59), which provides: " * * * every person * * * owning a motor vehicle * * * intended to be operated upon any highway in this state shall, before the same is so operated, apply to the division for and obtain the registration thereof and a certificate of title therefor."

■■ The Botetourt Motor Company, Inc., acquired no right to use or operate the motor vehicles upon the highway, hence there was no necessity to register them or to apply for certificates of title. The provision, excluding motor vehicles from the influence of section 5224, does not apply until they are registered under the provisions of the act.

The reason for the exclusion is obvious. The certificate of title issued on any motor vehicle is valid for the life of the motor vehicle. Once the vehicle is registered, legal title can be transferred only by the Motor Vehicle Commissioner. The statutory provisions contemplate a transfer of title on a simple assignment by the owner, or a compulsory transfer pursuant to a forced sale under execution or other lien. A complete record is kept in the Commissioner's office of every change of ownership of the car and of every lien or encumbrance placed thereon after registration.

If the provision of section 2154(64), excluding registered motor vehicles owned by the manufacturer or distributor in possession of a retail dealer from application of the provisions of section 5224 of the Traders' Act, were otherwise construed, then unregistered motor vehicles in possession of such dealer and exposed for sale as a part of the merchandise in stock would be exempt from levy of an execution obtained by a creditor of the dealer. A careful reading of the statute clearly shows that the provision was so phrased as to avoid this possibility.

It is immaterial whether the trustee in bankruptcy acquires the status of a lien creditor as of the date of filing the petition in bankruptcy or as of the date of the adjudication, because the automobiles were repossessed prior to either date.

Universal Credit Company obtained legal possession of the seven new automobiles before the rights of a *bona fide* purchaser or the rights of a lien creditor became involved. "In such cases the preferential nature of the transfer is to be judged as of the date of the basic agreement under which the lien was created by the parties, not as of the date when it was perfected as against the claims of creditors." *Union Trust Co.* v. *Townshend*, 101 F. (2d) 903, 914.

While it is unnecessary to discuss the effect of the registration of the motor vehicles in question, it is interesting to note that the applications for the registration and recordation of the liens on four of the cars were made within ten days from the date of delivery of the motor vehicles to the Botetourt Motor Company, Inc. When applications are made within such time, notice to all persons, including the Commonwealth, dates from the day on which the liens were acquired.

On July 18th and July 27, 1939, the Universal Credit Company obtained two chattel mortgages executed by the Botetourt Motor Company, Inc., on three used automobiles. On July 29th application was made to the Motor Vehicle Commissioner to transfer the certificates of title to the Botetourt Motor Company, Inc., and to record liens

thereon, totaling $552, in favor of the Universal Credit Company. These cars were permitted to remain in the possession of the Botetourt Motor Company, Inc., as a part of its stock in trade, but the titles to the cars were registered as required by statute, hence the provisions in sec. 2154(64), excluding the application of the provisions of section 5224, applies. These used cars were repossessed in the detinue action on August 11th at the same time that repossession of the seven new cars was obtained. The chattel mortgages were accepted in good faith for a present fair consideration. No question of an antecedent debt is involved. No diminution of the bankrupt's estate resulted from the giving and accepting of the chattel mortgages. The essential elements to create a voidable preference under former section 60, as well as under the 1938 amendment to the act, are lacking.

The second assignment of error is to the action of the trial court in refusing to allow the Universal Credit Company legitimate expenses incurred in repossession and sale of the ten motor vehicles.

█ The evidence shows that the Universal Credit Company, on the resale of the cars, received $4,995.39. This was $387.85 more than the amounts due on the chattel mortgages and conditional sales contracts. Against the $387.85, the Universal Credit Company attempted to charge the Botetourt Motor Company, Inc., with $510 for a protested check received from it, and five per cent. commission for reselling the property seized in the action. The trial court committed no error in refusing to allow payment for either of these items.

[█ The rights of the parties are fixed by the terms of the contract and the statute (sec. 5801). The chattel mortgages provided that if the mortgage should be placed with an attorney for collection, fifteen per cent. of the amount due thereunder should be allowed as an attorney's fee. Fifteen per cent. of this amount ($552),) or $82.80, is a proper charge to be allowed as an attorney fee under the former decisions of this court.

Code, section 5801, provides that when the plaintiff prevails in the trial of an action in detinue "under a contract which, regardless of its form or express terms, was in fact made to secure the payment of money to the plaintiff or his assignor, judgment shall be for the recovery of the amount due the plaintiff thereunder, or else the specific property, and costs, and the defendant shall have the election of paying the amount of said judgment or surrendering the specific property, and the court or justice may grant the defendant a reasonable time, not exceeding thirty days, within which to discharge such judgment upon such security being given as the court or justice may deem sufficient."

The contracts under consideration are termed chattel mortgages and conditional sales contracts, but, regardless of their form or their express terms, they were in fact made to secure the payment of money. Under the provisions of Code, section 5798, the specific property was returned to the plaintiff in the detinue action. It proceeded to sell the property without awaiting final judgment and without giving the defendants an opportunity to elect whether they would pay the amount due or surrender the specific property. See *Lloyd* v. *Federal Motor Truck Co.*, 168 Va. 72, 190 S. E. 257; Burks Pl. & Prac. (3 ed.), sec. 133.

Plaintiff elected to pursue its remedy and recapture the specific property in the action of detinue. This was done before plaintiff moved to transfer the case to the chancery side. Plaintiff having received the benefit of the statutes pertaining to detinue, it should assume the burdens imposed by the same statutes. As the plaintiff, by its action, has denied the defendants the right of election, the court should make the election for them. Since the amount received on a resale of the property is in excess of the amount due plaintiff, the court will give the defendants the benefit of the surplus.

Under the express terms of the conditional sale contracts and the chattel mortgages, the Botetourt Motor Company, Inc., agreed to pay expenses for retaking, repair-

ing and reselling the property. Any reasonable expense so incurred by the vendor is chargeable to the vendee. The evidence in this case shows that this total cost, including fifteen per cent. attorney's fees on the chattel mortgages, is $231.32. This amount, deducted from the surplus, leaves $156.53. This sum the plaintiff in the action of detinue holds in the nature of a trust for the benefit of the vendee or, in this case, its trustee in bankruptcy.

The conclusions stated in the foregoing paragraph render it unnecessary to discuss the third assignment of error.

There is no substantial dispute as to the facts stated in the foregoing discussion. As they are controlling, it is unnecessary to discuss other contentions based on other evidence advanced by appellees in support of the decree entered by the trial court.

For the reasons stated, the decree of the trial court is reversed and the cause remanded to the Circuit Court with direction to enter a final decree for appellant in accordance with the views herein expressed.

*Reversed and remanded.*