948

**In the Matter of Harold Cole MARKHAM.**
**No. 64–BK–43–C.**

United States District Court
W. D. Virginia,
Charlottesville Division.
April 19, 1966.

David M. Clark, Stern, Rendleman & Clark, Greensboro, N. C., for petitioner.

Charles R. Haugh, Gordon & Haugh, Charlottesville, Va., for trustee.

## OPINION

MICHIE, District Judge.

On December 31, 1964 petitioner, Jewel Box of Charlottesville, Inc., t/a Lowe's Jewelers (hereinafter referred to as Lowe's) petitioned this court for review of an order of the Referee in Bankruptcy of December 22, 1964. Thereafter on March 12, 1965 counsel for the trustee moved the court to remand this matter to the Referee for the taking of further evidence. After argument it was agreed that the court would hear the case *de novo* in lieu of a remand. On April 12, 1965 evidence was presented, at the conclusion of which the court asked counsel to submit briefs on the law, which they have done. Inasmuch as the property in question is in possession of the Bankruptcy Court, I have summary jurisdiction in this matter. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940), cf. Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

The controversy involves two diamond rings which the bankrupt, Markham, purchased from Lowe's in the summer of 1964 within four months of bankruptcy. Markham had entered into negotiations with Robert Anderson, the manager of Lowe's Charlottesville store, in April of 1964 regarding the purchase of a diamond engagement ring for his

fiancee, Mildred Peake, now his wife, Mildred P. Markham, as well as a man's diamond ring for himself. Sometime in June, 1964—Markham thought it was the first week in June, while Anderson placed it as the last week in June—Anderson delivered the rings to Markham at his office and Markham, in Anderson's presence placed the lady's ring on Miss Peake's finger. After this the negotiations continued and on July 24, 1964 Markham entered into a conditional sales agreement with Lowe's through Anderson whereby Markham agreed to pay for the rings in monthly installments of $500.00. Markham testified as follows regarding the negotiations:

THE COURT: Now you are talking about September. What date are you referring to when you say [you] purchased the ring?

A   I started the discussion with Bob in the latter part of April or May.

THE COURT: You started the discussion but when did you take the ring over and say you bought it?

A   We took the rings approximately the first of June, first week in June.

Q   Was it understood that you were taking it for good then?

A   Yes sir.

Q   In other words you had made your purchase then?

A   As far as I was concerned yes sir.

Q   Did you sign any kind of contract?

A   I don't recall signing any contract until the date that was signed which was on July 24th. We weren't in trouble financially at that point. We were still drawing income from insurance companies up to that point. I had no reason to even suspect I couldn't pay for it.

Q   Was there some negotiating back and forth about the tax—who was going to pay the tax on the ring?

A   I asked Bob if the corporation could give the ring to Mildred and his final advice was that it would be better if I paid the tax on it which I believe he included the tax in the price.

Q   Now when did this discussion take place—in June?

A   Sir?

Q   Was this before you took possession of the rings?

A   That was before we signed the contract.

Q   Is that the reason you waited to sign the contract?

A   No sir. Whenever he brought them I signed them.

Q   You may have answered this question but when did you say you actually took possession of the rings?

A   The best I recall it was sometime around the first part of June. I could be wrong on that because so much has happened since then. It was either the latter part of May or the first week in June, I am not quite sure.

Q   Actually this dealing back and forth with Mr. Anderson you really hadn't come to any fixed terms about what you were going to do and how you were going to pay for it until you put it in his contract, is that not true Mr. Markham?

A   That's about the truth because we hadn't signed anything and we hadn't agreed on anything. Bob and I were such good friends that we just— he knew at that time that I was making money and I was making money and the amount that was to be paid on the rings wasn't agreed upon until the day before or probably that day.

Q   After you got all the tax matters squared away and he brought the contract around to be signed and that represented the agreement on what you were going to pay?

A   That's right. We didn't talk about how much I was going to pay when I negotiated to buy.

*    *    *    *    *    *

Anderson's testimony regarding the negotiations leading up to the signing of the contract is as follows:

Q And that [conditional sales] contract would represent then the agreement between you and Mr. Markham concerning the purchase of these rings?

A That is correct.

Q Now Mr. Markham said that he had been negotiating about these rings since May. Is that correct?

A Yes sir.

\* \* \* \* \* \*

Q Between the time you sold the rings under the contract and you recorded it, did any information come to you from any where that Mr. Markham was in financial trouble?

A No sir at the time the ring was delivered to him my recollection is a little different from theirs as to the time of delivery. Mine is based on the fact that I sold it the week prior to our annual meeting in Greensboro which was the last day of June and during that week—the last week in June was when the ring was delivered to Mr. Markham initially. It was to be sold to him, if possible, without tax as a wholesale item to a corporation to be given as a gift, which is done normally through our Ned W. Cohen Associates and I told Mr. Markham I would check this out. This was then checked out and our comptroller said this could be done—anything could be given as a gift but if it were given as a gift the ten percent tax wouldn't be paid but the recipient would have to pay income tax. This would have amounted to at least twice the federal tax. Mr. Markham said then that he had rather pay the federal tax.

Q All that really means is that you hadn't really come to finished terms on how you were going to pay for it until this contract was gotten up?

A No sir other than the fact when it was delivered to him initially he wanted to pay enough down so the payments would be $100.00 a week. This

was at the time of delivery the latter part of June. He wanted to make one lump down payment so that the terms then would read $100.00 a week.

Q But that is not the way the contract is drawn?

A No sir.

Q Does that contract not represent what you finally agreed on?

A Yes sir.

\* \* \* \* \* \*

CROSS EXAMINATION

By: Mr. Haugh

Q Just a couple of questions Mr. Anderson. I believe you stated on direct examination something about Mr. Markham wanting $100.00 payments— would you tell us what terms he wanted?

A That was the terms he wanted. At the time we had solved the question of will tax be added or not to make one lump payment at that time which would leave a balance of $5200.00 at $100.00 a week.

Q He wanted to pay $100.00 a week?

A This is correct.

Q When was it changed from $100 a week to $500 a month?

A At the time of the signing on the 24th of July.

Q And $100.00 a week payments was perfectly all right with you?

A This is adequate.

From this testimony it seems to be impossible to determine just when the sale was consummated. But whether it was when the rings were delivered or later when the terms of payment were agreed upon and the conditional sales agreement executed would seem to make no difference in the result. For even if we assume that the purchase was completed at the time of the delivery of the rings thus nullifying the attempted retention of a security interest by the agreement of July 24th, the man's ring would still be an asset of the estate under § 70(a) (5) of the Bankruptcy Act. This

would also be the case with the lady's ring since Mrs. Markham voluntarily surrendered it at the first meeting of the creditors to the Trustee who thereafter held it as the property of the bankrupt. In re Consolidated Oil Co., 140 F.Supp. 614 (E.D.Mich.1956). Cf. In re Prokop, 65 F.2d 628 (7th Cir. 1933). See 5A Remington, Bankruptcy, § 2370 (5th ed. 1953). Furthermore, assuming a completed purchase at the time of delivery, Markham's gift of the lady's ring to Mrs. Markham constituted a voluntary transfer under § 55–81 of the Virginia Code and was, as to Markham's existing creditors at that time, a voidable transfer. I shall therefore proceed for the purposes of this opinion on the premise that the sale was not consummated until the execution of the contract on July 24th, a premise which I feel can be reasonably established from the evidence and which was assumed by counsel for both parties throughout the proceeding.

The contract called for monthly installment payments of $500 each to begin August 1, 1964. This agreement was filed in the Albemarle County Clerk's Office at 9:00 A.M. on September 9, 1964. On September 17, 1964 the bankrupt filed his voluntary petition in bankruptcy in this court. Neither the monthly installment for August nor that for September was ever paid.

The rings in question consist of a man's 1.03 carat diamond ring, the price of which appears on the contract to have been $495.00 and a 3 carat lady's solitaire priced at $6,930.00. Including the Federal Tax of $742.50 the total price of both rings came to $8,167.50. At the hearing the Trustee in Bankruptcy testified that, while going through the bankrupt's papers, he found an appraisal of the two rings, fixing the value of the man's ring at $1,500.00 and the lady's solitaire at $10,500.00. This appraisal was dated in July of 1964. It was further brought out that these rings constituted substantially all of the bankrupt's assets.

It appears from the evidence that, upon receiving the rings from Mr. Anderson, the bankrupt presented the lady's solitaire to his fiancee, Mildred Peake, as an engagement ring. She testified that Mr. Anderson was present when the bankrupt placed the ring on her hand and she accepted it. The bankrupt kept and wore the man's ring. During this time and up through September 9th, when the contract was filed, the bankrupt was living in Albemarle County, Virginia, while Miss Peake, who had possession of the lady's solitaire, was living in the City of Charlottesville, which is an independent political subdivision surrounded by Albemarle County.

The bankrupt testified that, at the time he was negotiating for the purchase of these rings and up until a couple of weeks before bankruptcy, he had no knowledge of the fact that he was insolvent. He testified that he first became aware of his insolvency two days before his first consultation with an attorney regarding his financial condition, this being the first week in September, 1964. Mr. Anderson testified that Markham had been a frequent customer of Lowe's prior to the purchase in question and had paid up his account at the end of every month. Anderson further testified that during the period of negotiation on the rings—May to July, 1964—Markham had stated to him that he was solvent and indicated that he had a statement of net worth on file with a local bank, which Anderson verified to be around $80,000 to $85,000. As an added precaution, before the purchase a credit check was run on the bankrupt and was found satisfactory. It was also brought out that Anderson and the bankrupt were good friends.

After Markham ascertained in the first part of September that he was insolvent, he went to see an attorney on Sunday, September 6th, about the advisability of going into bankruptcy. Markham testified that at this conference he asked the attorney whether he could call Anderson to inquire as to whether the contract was filed. He was advised to wait until later. The next day, the 7th, which was Labor Day, the attorney advised Markham that the contract had not been filed and Markham then called Lowe's to speak with

Anderson. As it turned out, Anderson was in Lowe's Staunton store that day and Markham contacted him there and asked him to get to another phone and to call him (Markham) back. Anderson testified that when he phoned back Markham asked him whether the contract was recorded. Anderson replied, "I believe so, but I will check and see. Why?", to which Markham responded, "We have checked and can't find that it is recorded and, if you haven't, I suggest you record it and don't tell anybody about this phone call." Markham explained that he called Anderson because they "had been such good friends and * * * had negotiated up to that point on terms that was [sic] agreeable with both of us which I thought was very fair and in all honesty to both sides I didn't think that Bob [Anderson] should lose the rings." He requested that Anderson call him back from an outside phone since he didn't want anybody in the store to learn of the situation which might possibly get Anderson into trouble.

There is a definite conflict as to when this call was made. Originally, Markham testified that it was on Labor Day, which was the 7th. However, on being recalled to the witness stand, he testified that he thought it was Tuesday, the 8th, in the latter part of the morning. Anderson was unable to testify as to the exact date of the conversation but inferred that it was on the 9th since he testified that, immediately after talking to Markham, he called the Charlottesville store and told the Assistant Manager to determine whether the contract had been filed and, if not, to file it at once, which, according to Anderson was what was done. Anderson further testified that, on the day in question, he arrived at the Staunton store at 8:30 A.M. and the phone was not ringing when he entered the store. Since there is positive evidence, in the form of the Clerk's stamp, that the contract was filed at 9:00 A.M. on September 9th, Markham's call could not have been made to Anderson in Staunton much later than 8:30 in order for the contract to have been filed when it was, if, in fact, the call was made on the 9th rather than the 7th or 8th.

The fixing of this date is important since Markham testified as to a second phone call to Lowe's made from the office of a second Charlottesville attorney, Mr. Joseph Wood, at a date subsequent to the Staunton call. At that time Markham again asked Anderson whether he had recorded the contract. To this he received a negative reply and a request that the rings be returned. Markham then turned the phone over to his attorney, Mr. Wood. Mr. Wood testified that he didn't know to whom he was speaking but that it was a man's voice. The party requested that the rings be returned but Mr. Wood advised him that Markham was about to go into bankruptcy and that he, Wood, could not advise that they be returned. Mr. Wood's best recollection as to the date of this conversation was the afternoon of the Tuesday after Labor Day, that being September 8th. Mr. Anderson, on the other hand, denies any knowledge of this second conversation.

As to the date of this second telephone conversation the bankrupt testified that he wasn't sure whether it was one or two days after the Staunton call but thought it was after lunch on Tuesday, the 8th. On recall he testified that, to the best of his recollection, the second call was after lunch on Wednesday, the 9th, which he believed was a day after the Staunton call.

Mrs. Markham testified that she was present in Mr. Wood's office during the alleged second telephone call and that it took place on Tuesday, September 8th. She testified that Markham had requested to use the phone to call Anderson which he did. Though Mrs. Markham was unable to testify as to the identity of the party on the other end, she did recall that Mr. Wood took the phone and explained to the other party that he could not advise Markham to return the rings since they were an asset in bankruptcy.

The facts as to these telephone calls are important since, in order to show a *voidable* preference and thereby set aside the transfer, the Trustee must prove that the petitioner, Lowe's, had

reasonable cause to believe that the bankrupt was insolvent when the preference was suffered. I shall defer further discussion of these facts until I take up the question of voidability of the preference.

I. The relevant portions of the Bankruptcy Act are as follows:

§ 1(30) * * * [T]he retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor;

[11 U.S.C. § 1(30) (1958)]

§ 60. Preferred creditors.

(a) (1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

(2) For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. * * * If any transfer of real property is not so perfected against a bona fide purchase, or if any transfer of other property is not so perfected against such liens by legal or equitable proceedings prior to the filing of a petition initiating a proceeding under this title, it shall be deemed to have been made immediately before the filing of the petition.

(3) The provisions of paragraph (2) of this subsection shall apply whether or not there are or were creditors who might have obtained such liens upon the property other than real property transferred and whether or not there are or were persons who might have become bona fide purchasers of such real property.

* * * * *

(6) The recognition of equitable liens where available means of perfecting legal liens have not been employed is declared to be contrary to the policy of this section. * * *

(7) Any provision is this subsection a to the contrary notwithstanding if the applicable law requires a transfer of property other than real property for or on

Before a transfer may be set aside in bankruptcy as a preference it must be shown (1), that the transfer constituted a preference as defined in section 60(a) of the Bankruptcy Act [1] (here-

account of a new and contemporaneous consideration to be perfected by recording, delivery, or otherwise, in order that no lien described in paragraph (2) of this subsection could become superior to the rights of the transferee therein, or if the applicable law requires a transfer of real property for such a consideration to be so perfected in order that no bona fide purchase from the debtor could create rights in such property superior to the rights of the transferee, the time of transfer shall be determined by the following rules:

I. Where (A) the applicable law specifies a stated period of time of not more than twenty-one days after the transfer within which recording, delivery, or some other act is required, and compliance therewith is had within such stated period of time; or where (B) the applicable law specifies no such stated period of time or where such stated period of time is more than twenty-one days, and compliance therewith is had within twenty-one days after the transfer, the transfer shall be deemed to be made or suffered at the time of the transfer.

II. Where compliance with the law applicable to the transfer is not had in accordance with the provisions of subparagraph (I) of this paragraph, the transfer shall be deemed to be made or suffered at the time of compliance therewith, and if such compliance is not had prior to the filing of the petition initiating a proceeding under this title, such transfer shall be deemed to have been made or suffered immediately before the filing of such petition.

* * * * *

§ 60(b) Any such perference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property or, if it has been converted, its value from any person who has received or converted such property, except a bona-fide purchaser from or lienor of the debtor's transferee for a present fair equivalent value: Provided, however, That where such purchaser or lienor has given less than such value, he shall nevertheless have a lien upon such property,

inafter referred to as the Act) and (2), that it is voidable as defined in section 60(b) of the Act. The burden of proof as to both of these elements rests on the Trustee. Aulick v. Largent, 295 F.2d 41 (4th Cir. 1961). Taking them in order, the first issue is whether the transfer complained of constituted a preference.

In this case the main controversy as to whether there was a preference as stated in section 60(a) (1) of the Act centers on the issue of whether the conditional sales contract complained of constituted a transfer suffered by the bankrupt Markham of his property for or on account of an antecedent debt. As for the other essential elements under section 60(a) (1), they are clearly established from the record and raise no real controversy. I shall defer discussion of them to a later point in the opinion.

First, was there a transfer suffered by Markham of his property?

■■ Section 1(30) of the Act was amended in 1952 to include in the definition of a transfer suffered by the debtor the retention of a security title to property delivered to the debtor.[2] Thus, it seems clear that the retention of security title under a conditional sales contract is a transfer within the meaning of the Bankruptcy Act. Matter of Morasco, 233 F.2d 11 (2d Cir. 1956); In re Burton, 120 F.Supp. 148 (D.Md.1954).[3]

Having established a transfer, the issue now becomes one of when it occurred. Petitioner, Lowe's, argues that the transfer occurred at the time of the *execution* of the conditional sales agreement, that being July 24, 1964. The Trustee, on the other hand, argues that in the case of the man's ring, the transfer took place at the time of *filing*, September 9, 1964, of the agreement in the Albemarle County Clerk's Office.[4] As for the lady's solitaire, the Trustee contends that the

but only to the extent of the consideration actually given by him. Where a preference by way of lien or security title is voidable, the court may on due notice order such lien or title to be preserved for the benefit of the estate, in which event such lien or title shall pass to the trustee. For the purpose of any recovery or avoidance under this section, where plenary proceedings are necessary, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction. [11 U.S.C. § 96 (1958)]

2. The intent of this 1952 amendment was to overcome conclusively the Court's decision in Bailey v. Baker Ice Machine Co., 239 U.S. 268, 36 S.Ct. 50, 60 L.Ed. 275 (1915). In Bailey the Court held that under the 1910 version of the Bankruptcy Act a tardy filing of a conditional sales contract within the four month period was not a preferential transfer. It reasoned that for there to be a preferential transfer within the meaning of section 60 the transfer, *inter alia*, had to be made *by* the bankrupt of his own property. Under the terms of the conditional sales contract in question there the title to the property remained in the seller. This was partially remedied by the Chandler Act of 1938 wherein section 60 was broadened to include involuntary transfers "suf-

fered" by the bankrupt as well as those voluntarily "made" by him. C. 575, § 60, 52 Stat. 840, 869 (1938). Even so, Congress, in 1952, apparently felt that a clearer intent could be expressed by amending the definition of transfer to expressly include retention of security title by the seller. Glessner v. Massey-Ferguson, Inc., 353 F.2d 986 (9th Cir. 1965); H.R.Rep. No. 2320, 82nd Cong., 2d Sess. 4, 1952 Code Cong. & Admin. News, 1960, 1963; 4 Remington, Bankruptcy, § 1672.2 (1957 ed.).

3. Cf. Glessner v. Massey-Ferguson, Inc., note 2, supra; Sims v. Capitol Refrigeration Co., 294 F.2d 111 (2d Cir. 1961). Contra, In re Lloyd, 6 F.Supp. 514 (M.D. Pa.1934). With its reliance on Bailey v. Baker Ice Machine Co., supra, it seems apparent that Lloyd was also legislatively overruled by the 1952 amendment to the definition of transfer in section 1(30) of the Act; cf. Carina Mercury, Inc. v. Igaravides, 344 F.2d 397 (1st Cir. 1965) (It appears that the 1st Circuit finds the possession-title rationale of *Bailey* unimpaired by Congressional action.)

4. While both the execution and filing dates were within the four month period before bankruptcy, it is still important to ascertain as to which date the transfer occurred since the other essential elements of a voidable preference must be found as of that date.

contract was never properly perfected as required by Virginia law [5] since the contract was filed only in Albemarle County though the lady's ring was at all times in the possession of Miss Peake who was residing in the City of Charlottesville. Thus, it is the Trustee's position that under section 60(a) (2) the transfer as to the lady's ring should "be deemed to have been made or suffered immediately before the filing of the petition." I conclude that I must uphold the contentions of the Trustee as to both rings. I will first consider the contention as to the man's ring.

### Man's Ring

Up until 1938 there had been considerable controversy relating to when a preferential transfer was deemed to have been made. See Glessner v. Massey-Ferguson, Inc., 353 F.2d 986 (9th Cir. 1965) and cases therein cited; 4 Remington, Bankruptcy, § 1696 (1957 ed.). During this period conditional sales agreements were held *not* to constitute preferential transfers. E. g., Bailey v. Baker Ice Machine Co., supra; In re Lloyd, 6 F.Supp. 514 (M.D.Pa.1934).

In 1938, the Chandler Act amended section 60 [6] and introduced a new approach to preferential transfers by providing a "bona fide purchaser" test to determine when a transfer was "made or suffered" by a debtor.

[T]he test became, not one of whether local law required or permitted recording of the transfer, but of whether, prior to the four month period, the transfer had become so far "perfected," by recording or otherwise, as to be beyond the reach of the creditors of the debtor-transferor and beyond possibility of a claim by a purchaser of the property that his rights were superior to the transferee's.

4 Remington, Bankruptcy, p. 302 (1957).

In 1950 section 60 was rewritten [7] to provide a bona fide purchaser test for realty and a lien creditor test as to personalty.[8]

Not until the transfer meets whichever of these tests is applicable is it "deemed" to have been made, and if it does not meet the test before the bankruptcy of the debtor-transferor, it is "deemed to have been made immediately prior to" filing of the bankruptcy or debtor-relief petition.

4 Remington, Bankruptcy, pp. 302, 303.

It is important also to note the language of § 60(a) (3) [9], added in 1950,

---

5. Va.Code Ann. § 55–88 (repl. vol. 1959) Agreements for conditional sales, or reservation of title or lien.—Every sale or contract for the sale of goods and chattels, wherein the title thereto or a lien thereon is reserved until the same be paid for, in whole or in part, or the transfer of title is made to depend on any condition, when possession is delivered to the vendee, shall, in respect to such reservation and condition, be void as to creditors of the vendee, who acquire a lien upon the goods and as to purchasers from the vendee, for value without notice, unless such sale or contract be evidenced by writing, signed by the vendor and the vendee, setting forth the date thereof, the amount due, when and how payable, a brief description of the goods and chattels, and the terms of the reservation or condition; and unless such writing is filed with the clerk by whom deeds are admitted to record, as provided by law, of the county or corporation in which such goods and chattels may be; provided, that if such filing be done within five days from the delivery of the goods and chattels to the vendee, it shall be as valid as to creditors and purchasers as if such filing had been done on the day of such delivery of the goods and chattels.

6. C. 575, § 60, 52 Stat. 840, 869 (1938).

7. Supra, note 1.

8. In applying the lien creditor test to determine when a transfer of personalty is made or suffered by the debtor it is important to ascertain first whether under applicable state law the lack of recordation makes a transfer subordinate to an intervening judgment lien creditor defined in section 60(a) (2) of the Act. Failure to record within the 5 day grace period under the applicable Virginia statute, § 55–88, subordinates the conditional sales lien to the rights of an intervening lien creditor of the vendee.

9. C. 70, § 1, 64 Stat. 24 (1950); 11 U.S.C. § 96(a) (3) (1958).

which makes immaterial any question as to whether such a lien creditor or bona fide purchaser ever existed. This provision was added to overcome decisions such as Universal Credit Co. v. Botetourt Motor Co., 180 Va. 159, 21 S.E.2d 800 (1942) (relied upon here by Lowe's). That case held that since the assignor of the conditional sales contract took possession of the property covered by the contract before bankruptcy and before the rights of a bona fide purchaser or of a lien creditor became involved, the preferential nature of the transfer was to be measured as of the date of execution of the contract rather than its date of perfection as against the claims of creditors. The court was requiring the existence of an actual lien creditor.

Furthermore, in 1950, Congress by amendment expressed its intent that "[t]he recognition of equitable liens where available means of perfecting legal liens have not been employed is hereby declared to be contrary to the policy of this section." Bankruptcy Act C. 70 § 60(a) (6), 64 Stat. 25 (1950), 11 U.S.C. § 96(a) (6) (1958 ed.); McKnight v. M. & J. Finance Corp., 247 F.2d 112 (4th Cir. 1957). Petitioner Lowe's, in urging that the date of transfer was the date of execution of the conditional sales contract, relies on the holding of Union Trust Co. of Maryland v. Townshend, 101 F.2d 903 (4th Cir. 1939) which involved a 1931 bankruptcy. The court there held that the issue of whether there was a voidable preference was to be determined at the date of the transfer and that in the case of an equitable lien this date was that on which the agreement giving rise to an equitable lien was entered into and not some earlier date on which there was a mere agreement to give such a lien nor some later date on which there was an acquisition of property to which the equitable lien attached. In particular Lowe's points to the following language in support of its position:

[A]n agreement creating an equitable lien, not preferential at the time of the agreement, does not become preferential because of the condition of the

debtor at the time that it attaches to subsequently acquired property, * *. In such cases the preferential nature of the transfer is to be judged as of the date of the basic agreement under which the lien was created by the parties, not as of the date when it was perfected as against the claims of creditors.

Id. at 913, 914.

However, the present section 60(a) (2) states that a transfer is not deemed to have been suffered until it becomes "so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee." In addition, the applicable Virginia law, section 55–88, provides means for filing conditional sales contracts so as to perfect them against subsequent lien creditors. But they do not become so perfected until they are filed as provided by law. In light of these provisions, I am forced to conclude that the Townshend decision has been legislatively overruled insofar as the case at bar is concerned. See 3 Collier, Bankruptcy, ¶ 60.43 p. 998 n. 37. McKnight v. v. M. & J. Finance Corp., supra; In re Kaufman, 142 F.Supp. 759 (W.D.Ky. 1956). See 4 Remington, Bankruptcy, § 1725 (1957).

■ Considering the instant case in the light of these principles, section 1(30) deems the retention of security title by the vendor, Lowe's, a transfer suffered by the debtor, Markham, of his property. While in fact the transfer occurred on July 24, 1964, as a matter of law under § 60(a)(2) this transfer was not suffered until the date of its perfection under the law of Virginia which requires recordation of conditional sales agreements before they will prevail over subsequent lien creditors of the vendee. Va. Code Ann. § 55–88 (Repl. Vol. 1959). Therefore, under section 60(a) (2) the transfer giving rise to this preference (i. e., the retention of security title by Lowe's) is not deemed to have been suffered until September 9, 1964 when the

vendor, Lowe's, filed the agreement pursuant to § 55–88 of the Virginia Code.

The next step is to ascertain whether this "transfer" [10] was "for or on account of an antecedent debt." It is here that § 60(a) (7) [11] of the Bankruptcy Act becomes pertinent. This section provides for a grace period equal to that allowed under applicable state law—but not to exceed 21 days—where the applicable state law requires a transfer of personalty "for or on account of a new and contemporaneous consideration to be perfected by recording, delivery, or otherwise, in order that no lien described in * * * [subsection 60(a) (2)] could become superior to the rights of the transferee therein, * * * ."

■ The Virginia statute, § 55–88, set forth in footnote 5 supra, requires the filing of conditional sales contracts and until so filed they are not perfected as to subsequent lien creditors. However, the statute provides a grace period of five days within which time a filing will relate back to the date of the execution of the contract and, under the provisions of § 60(a) (7) of the Bankruptcy Act, the "transfer" will be deemed to have been for present consideration therefore defeating an essential element of a preference. However, while failing to file within five days does not void the security interest under Virginia law, it does, under the Bankruptcy Act, make the tardy filing a "transfer" on account of an antecedent debt. In re Burton, 120 F. Supp. 148 (D.Md.1954). This result is necessary since, otherwise, parties would be free to conceal the fact of a lien and, thereby, the debtor's real financial condition, thus making the debtor appear financially sounder than he in fact is. The penalty is therefore quite properly imposed on the creditor who does not record. See discussion in Corn Exchange Nat. Bank & Trust Co., Philadelphia v. Klauder, 318 U.S. 434, 439, 63 S.Ct. 679,

87 L.Ed. 884 (1943) (dictum); MacLachlan, Bankruptcy § 259 (1956).

As to the requirement that there be a depletion of the bankrupt's estate as the result of the "transfer," it is clear that if the conditional sales agreement executed by Markham is enforceable against the trustee in bankruptcy, then there will be a depletion of the bankrupt's estate in the amount of $8,167.50.

Likewise, it is also clear that the "transfer" here complained of was made for the benefit of the creditor, Lowe's. Section 1(11) of the Bankruptcy Act defines a creditor as "anyone who owns a debt, demand, or claim provable in bankruptcy, and may include his duly authorized agent, * * * ." 11 U.S.C. § 1(11) (1958). The creditor status must have been created prior to the "transfer" complained of. Otherwise, there could not be an antecedent debt. Here the sale of the rings to the bankrupt created a debtor-creditor relationship between the bankrupt, Markham, and the creditor, Lowe's. This debt being one evidenced by contract, it is provable under § 63(a) (4) of the Act.

In addition, it is clear that the "transfer" was made while the bankrupt, Markham, was insolvent. Since I have concluded that the "transfer" complained of was suffered as of September 9, 1964, the insolvency of Markham must be measured from that date, and his insolvency would seem clear in that all the debts listed in the schedule were incurred by Markham before September 9th.

■ Furthermore, the effect of this "transfer," if upheld, will be to enable the creditor, Lowe's, to obtain a greater proportion of its debt than some other creditors of the same class. By creditors of the same class it is meant that the creditor must gain advantage over some or all of the creditors in its class as set forth in § 64 relating to priorities. All creditors other than those

---

10. Hereafter the word "transfer" set off by quotation marks refers to the *de jure* transfer as defined by section 60(a) (2) of the Act.

11. Supra, note 1.

classified in § 64 are general creditors and belong to the same class, whether secured or unsecured. Glessner v. Massey-Ferguson, Inc., supra. After the execution and before the filing of the contract Lowe's was an unsecured creditor and by filing the agreement beyond the grace period sought to gain an advantage over the other unsecured creditors of the bankrupt.

The result of this analysis leads me to conclude that the belated filing of the conditional sales contract by Lowe's on September 9th constituted a preference as to the man's ring.[12]

### Voidability of a Preferential Transfer

■ Before a preference may be set aside by the Trustee it must be shown to be voidable, i. e., that the creditor, or his agent acting with reference to the preference, had reasonable cause at the time of the preferential transfer to believe that the debtor was insolvent. Section 60(b), note 1, supra.

■ While "reasonable cause" does not require an actual belief, it does require more than a mere suspicion of the debtor's insolvency. Clower v. First State Bank of San Diego, Tex., 343 F.2d 808 (5th Cir. 1965); Robinson v. Commercial Bank of North America, 320 F.2d 106 (2d Cir. 1963); 3 Collier, Bankruptcy ¶ 60.53 (1964 ed.). It may be inferred from such information concerning the debtor's financial condition as would lead a prudent business person to conclude that the debtor was insolvent. Cf. Cedar-Comp Materials Co. v. Bumb, 344 F.2d 256 (9th Cir. 1965); Kelley v. National Sur. Corp., 187 F.Supp. 329 (S.D.W.Va.1960). I find the rule summarized in the words of Judge Wisdom of the 5th Circuit:

Cases on the point have evolved a fine line to apply in determining whether a creditor has "reasonable cause to believe" that a debtor is insolvent. For reasonable cause to exist, it is not necessary that a person bene-fitted by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met. Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392, 394–395 (5th Cir. 1961) (Wisdom, J.).

In the case of the man's diamond ring, since the evidence shows that the contract was properly filed on September 9, 1964 at 9:00 A.M., it is as of that time that the creditor's reasonable cause to believe Markham to have been insolvent, must be shown.

Here there are two important facts which I find occurred prior to the filing on September 9th. First, the debtor Markham had not paid either his August or September 1964 installments of five hundred dollars each. Secondly, Lowe's agent, Anderson, received a telephone call from the bankrupt who asked him to go to a pay phone and call him back. The substance of the return call was that if the contract had not been recorded, it should be and that Anderson was to say nothing about this conversation.

As to the conversation which took place over the phone from the attorney's office, there is conflicting evidence. However, it seems clear from the evidence that the call was made to someone at Lowe's store in Charlottesville. The substance of the call indicated that Lowe's hadn't filed but instead wanted the rings back, to which they were advised by Markham's attorney that, since Markham was going into bankruptcy, the rings could not be returned.

In sum I find as a fact that this second call occurred before the filing of the con-

---

12. Inasmuch as I hold that the agreement was not properly filed with respect to the lady's solitaire ring, I shall discuss at a later point in this opinion why the agreement is not enforceable against the Trustee with respect to that ring.

tract and that the sequence of events was as follows: Markham consulted his first attorney and the following day was advised that the contract had not been filed; Markham then made the phone call to Anderson in Staunton; Markham conferred with his second attorney, Mr. Wood, and made the phone call from Mr. Wood's office to Lowe's Charlottesville store, at which time Mr. Wood advised the party on the phone that the rings could not be returned since his client Markham was going into bankruptcy; the contract was then filed at 9:00 A.M. September 9, 1964 in the Albemarle County Clerk's Office.

From these facts I conclude that on the basis of the payment defaults together with the Staunton telephone call there was reasonable cause for Lowe's through its agents to believe that Markham was insolvent when it subsequently filed the contract. The later telephone call from the attorney Mr. Wood's office merely furnished the *coup de grace*.

Thus, I conclude that the filing of the conditional sales agreement by Lowe's on September 9th constituted a *voidable* preference as to the man's ring.

### Lady's Solitaire

I shall now take up the Trustee's contention as to the lady's solitaire diamond ring. The Trustee contends that under section 60(a) (2) of the Act the "transfer" with respect to the lady's ring occurred as a matter of law "immediately before the filing of the petition" in bankruptcy. With this contention I agree. The facts as to the lady's ring show that it was delivered in Charlottesville to Markham by Anderson and

that in the presence of Anderson Markham placed the ring on the finger of his fiancee, Mildred Peake, who at all times pertinent hereto resided in the City. Furthermore, it would seem clear that Anderson knew that Markham's purpose in purchasing the ring was to present it as an engagement ring. The conditional sales contract indicates on its face that the merchandise was given to Mildred Peake. From the time that the ring was placed on Miss Peake's hand to the time of the filing of the contract by Lowe's, Miss Peake was residing in the City of Charlottesville. Hence the ring being in the city, and Lowe's through its agent Anderson having actual notice of this fact, it was there that the contract had to be filed to be effective under § 55–88 of the Virginia Code. Tokheim Oil Tank & Pump Co. v. Fentress, 33 F.2d 730 (4th Cir. 1929).[13] While the conditional sales agreement was in fact never properly filed in accordance with Virginia law, it is deemed, under the provisions of sections 60(a) (2) and 60(a) (7) of the Act, to have been perfected "immediately before" the filing of the petition in bankruptcy. Corn Exchange Nat. Bank & Trust Co., Philadelphia v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884 (1943). At that time it is clear that Markham was in fact insolvent.

As for the other essential elements of a preference, the discussion and findings, supra, relating to the man's ring are applicable here as to the lady's ring.[14]

"Immediately prior" to bankruptcy the creditor, Lowe's, knew that Markham was in default on his installment payments. Anderson had received the call from Markham in Staunton with

13. It was the intent of the legislature to protect the vendor, not the vendee, from subsequent lien creditors of, or bona fide purchasers from, the vendee without notice. Thus, before he can reap the benefit of section 55–88, the vendor must comply strictly with the provisions of the statute. Mack International Motor Truck Corp. v. Jones & Combs, 153 Va. 183, 149 S.E. 544 (1929). See 3 M. J. Chattel Mortgages and Conditional Sales, §§ 18, 20 (1949).

14. By entering into the conditional sales agreement reserving title in Lowe's, as to the property [lady's solitaire] delivered to Markham, Markham suffered a transfer under section 1(30) of the Act which, because of Lowe's failure to properly file, was in consideration of an antecedent debt and, if given effect, would deplete his estate and prefer Lowe's over his other existing creditors of the same class.

regard to whether the contract had been filed and actual notice had been given to Lowe's of Markham's impending bankruptcy during the conversation with Lowe's which originated from the attorney, Mr. Wood's, office.

In light of this I conclude that Lowe's or its agents acting with reference to the "transfer" "immediately before" bankruptcy had reasonable cause to believe that Markham was insolvent.[15]

In sum, the retention of the security interest by Lowe's which, as to the man's ring, it perfected properly—though outside the statutory grace period and within four months of bankruptcy—by filing in Albemarle County on September 9th and which, as to the lady's solitaire ring, it is deemed to have perfected as a matter of law under section 60(a) (2) of the Act "immediately before" the filing of Markham's voluntary petition in bankruptcy constituted a *voidable* preference in favor of Lowe's which the Trustee is empowered to avoid or preserve for the benefit of the estate as he so elects.

An appropriate order will be entered.

---

15. In his brief the Trustee urged the construction placed on the § 60(a) (2) phrase "immediately before the filing of the petition" by the Seventh Circuit.

That Court construed this phrase to mean "contemporaneously with bankruptcy." In re Cox, 132 F.2d 881, 883 (7th Cir. 1943). My research indicates that this construction has neither been approved nor disapproved by any other court, nor repeated by the Seventh Circuit. The effect of this construction is to convert the "reasonable cause" test from one of fact to one of law in the particular case where the transfer was not perfected before bankruptcy. Had Congress intended this result I feel that they would have so indicated it and, in the absence of any such indication, the adoption of such a construction would be contrary to the plain meaning of the words "immediately before".